[Crim. No. 42068. Second Dist., Div. One. Apr. 28, 1983.]

THE PEOPLE, Plaintiff and Respondent, v.
LESLIE LOUIS SZARVAS, Defendant and Appellant.

512

514

## COUNSEL

Marks & Brooklier and Anthony P. Brooklier for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Daniel Kremer, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Robert R. Anderson and Christine C. Franklin, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**HANSON (Thaxton), Acting P. J.**—This is an appeal from convictions of five counts of transferring recorded sounds for unlawful use (Pen. Code, § 653h, subd. (a)(1)), and of petty theft (Pen. Code, § 484). We affirm the convictions, as modified.

### FACTS

Defendant Leslie Louis Szarvas (hereinafter referred to as Szarvas) operated an establishment known as DISContinued Records. Many of the records stocked by DISContinued Records were hard to find or out of print. For a fee, Szarvas would record a selection or an entire album for a customer.

On August 28, 1981, Kenneth Munson, a private investigator for the Recording Industry Association of America (hereinafter referred to as RIAA) purchased a taped copy of the Beach Boys' album "Shutdown" from Szarvas.

On September 1, 1981, Noel Castleman, another RIAA investigator, purchased taped copies of the Beatles' album "The Beatles 1962-1966" and Elvis Presley's album "Elvis' Golden Records" from Szarvas.

In September 1981, Chris Thomas, a Burbank police detective, purchased taped copies of Chet Atkins' album "Hi Fi in Focus" and Hank Williams' album "I'm Blue Inside" from Szarvas.

### PROCEDURAL BACKGROUND

On September 14, 1981, Szarvas was arrested and, pursuant to a search warrant, a majority of the phonograph records were seized from DISContinued Records.

In the district attorney's second amended information, Szarvas was charged with five counts of violating Penal Code section 653h, subdivision (a)(1)[1] (each count consisting of one of the aforementioned albums) and one count of violating Penal Code section 487, subdivision 1.[2] It was further alleged that in the commission of count six (grand theft), Szarvas took funds and property of a value exceeding $25,000. Szarvas pleaded not guilty and denied the enhancement allegation.

Trial was had by jury. On January 29, 1982, the jury found Szarvas guilty as charged in counts I through VI of the second amended information. Szarvas was found not guilty of grand theft as charged in the second amended information but guilty of petty theft, a lesser included offense of grand theft. Szarvas filed his motion for a new trial the same day. This motion was denied on March 1, 1982. Szarvas was placed on probation on counts I through V for a period of three years, subject to certain conditions including that he pay a fine of $1,500 per count ($7,500 total), cooperate with any related civil judgment and refrain from transferring recorded sounds without a license or consent. Szarvas was placed on probation without formal supervision on count VI for a period of 90 days.

## ISSUES

On appeal, Szarvas contended these convictions should be reversed on the following grounds: 1) the jury was not instructed on the doctrine of fair use as it applies to federal copyright law; 2) the court did not instruct the jury *sua sponte* on the defense of mistake of fact regarding the victim's consent; 3) the prejudicial effect of testimony concerning "bootleg recordings" was not cured by the court's admonishment to the jury to disregard all such testimony or evidence; 4) the court allowed a nonexpert witness give an opinion concerning an ultimate issue of the case; 5) Szarvas did not have the effective assistance of counsel.

---

[1] "Every person is guilty of a public offense punishable by imprisonment in the state prison for a term not to exceed one year and one day, or by imprisonment in the county jail not to exceed one year, or by a fine not to exceed twenty-five thousand dollars ($25,000), or by both such imprisonment and fine, who:

"(1) knowingly and willfully transfers or causes to be transferred any sounds that have been recorded on a phonograph record, disc, wire, tape, film or other article on which sounds are recorded, with intent to sell or cause to be sold, or to use or cause to be used for profit through public performance, such article on which such sounds are so transferred, without the consent of the owner."

[2] At the time of the information, Penal Code section 487 stated, in pertinent part:

"Grand theft is theft committed in any of the following cases:

"1. When the money, labor or real or personal property taken is of a value exceeding two hundred dollars ($200); . . ."

DISCUSSION

I. *The Doctrine of Fair Use*

In the recent case of *Marcus* v. *Rowley* (9th Cir. 1983) 695 F.2d 1171, the United States Court of Appeals for the Ninth Circuit explained the doctrine of fair use. The court, at pages 1174-1175, stated:

"Fair use is most often defined as the 'privilege in others than the owner of a copyright to use the copyrighted material in a reasonable manner without his consent, notwithstanding the monopoly granted to the owner . . . .' *Rosemont Enterprises, Inc.* v. *Random House, Inc.* 366 F.2d 303, 306 (2d Cir. 1966), *cert. denied,* 385 U.S. 1009, 87 S.Ct. 714, 12 L.Ed.2d 546 (1967). [Citations omitted.] This doctrine was judicially created to 'avoid rigid application' of the copyright laws when that application would defeat the law's original purpose which was the fostering of creativity. *Iowa State University Research Foundation, Inc.* v. *American Broadcasting Cos.,* 6521 F.2d 57, 60 (2d Cir. 1980). Because the doctrine was developed with a view to the introduction of flexibility and equity into the copyright laws, it has evolved in such a manner as to elude precise definition. *Universal City Studios, Inc.* v. *Sony Corp.* 659 F.2d 963, 969 (9th Cir. 1981), cert. granted, 457 U.S. 1116, 102 S.Ct. 2926, 73 L.Ed.2d 1328 (1982). It is, as Professor Nimmer has stated, a 'most obscure doctrine.' 3 *Nimmer on Copyright,* § 13.05 at 13-54.1 (1982).

". . . . . . . . . . . . . . . . . . . . . .

"The doctrine of fair use was a judicially articulated concept until Congress recognized its importance and incorporated it into section 107 of the revised Copyright Act. The legislative history states that '[s]ection 107 is a restatement of this judicially developed doctrine—it neither enlarges nor changes it in any way.' 122 Cong. Rec. 3144 (1976) (statement of Sen. Tunney). See H.R. Rep. No. 1476, 94th Cong., 2d Sess. 66, reprinted in 1976 U.S. Code Cong. & Ad. News 5659, 5690 [Hereinafter cited as H.R. Rep. (1976)]. Thus, the cases dealing with the doctrine of fair use under the common law and those under section 107 both give consideration to the same factors in analyzing whether the doctrine should apply. Section 107 codifies the factors developed under the prior case law."

Title 17 United States Code, section 107 states: "Notwithstanding the provisions of section 106, the fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by that section, for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not

an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include—

"(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

"(2) the nature of the copyrighted work;

"(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

"(4) the effect of the use upon the potential market for or value of the copyrighted work."

■ Applying these factors to the case at bench, we find that the trial court properly concluded that the doctrine of fair use did not apply to Szarvas' business.

## A. *The Purpose and Character of the Use*

The first factor to be considered in determining whether the doctrine of fair use applies is the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes.

In the case at bench, Szarvas' operations could only be described as a commercial enterprise. In his testimony, Szarvas estimated that in the year before his arrest, the sale of duplicated records provided a gross income of $62,500. There was also testimony that the income from the sale of duplicated records increased each of the years before this. This factor weighs heavily against the applicability of the fair use doctrine.

## B. *The Nature of the Copyrighted Work*

The second factor to be considered in determining whether the doctrine of fair use applies is the nature of the copyrighted work. There is a greater chance of finding fair use when the work is "informational" as opposed to "entertainment." (3 Nimmer on Copyright (1982) § 13.05[A][2] at p. 13-63.) The songs duplicated by Szarvas were produced for entertainment purposes. This weighs against application of the doctrine of fair use. One factor in Szarvas' favor is Senate Report No. 94-473, 94th Congress, 1st Session (1975) at page 64, which states: "a key, though not necessarily determinative, factor in fair use is whether or not the work is available to the potential user. If the work is 'out of print' and unavailable for purchase through normal channels, the user may have more justification for reproducing it than in the ordinary case."

Some of the records that Szarvas was charged with duplicating were out of print or at least difficult for consumers to obtain.

### C. *The Amount and Substantiality of the Portion Used*

The third factor to be considered in determining whether the doctrine of fair use applies is the amount and substantiality of the portion used in relation to the copyrighted work as a whole. In the case at bench, Szarvas would duplicate entire songs and, in some cases, entire albums. As stated by Professor Nimmer in 3 Nimmer on Copyright, *supra,* § 13.05[A][3] at p. 13-64, "whatever the use, *generally it may not constitute a fair use if the entire work is reproduced."* (See also *Marcus* v. *Rowley, supra,* 695 F.2d 1171 at p. 1176.) Thus this factor weighs heavily against application of the fair use doctrine.

### D. *The Effect of the Use Upon the Potential Market*

The fourth factor to be considered in determining whether the doctrine of fair use applies is the effect of the use upon the potential market for or value of the copyrighted work. As stated by Professor Nimmer in 3 Nimmer on Copyright, *supra,* § 13.05[A][4] at p. 13-65, this factor "poses the issue of whether unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in a substantially adverse impact on the potential market for or value of the [copyright owner's] work." In the case at bench, Szarvas would duplicate particular songs from albums. While it is true that the prices Szarvas charged were high enough that duplicating two songs would cost more than purchasing a currently released album, if this were done on a widespread basis, the price would naturally fall thereby seriously affecting the value of the copyright owner's work. To the extent that certain songs and albums were out of print, the copyright owner is still adversely affected since public demand for any rerelease of the album is reduced. Therefore, this factor weighs against finding the fair use doctrine applicable.

As stated above, the factors listed in 17 United States Code, section 107 are not exclusive. However, in the balance, they weigh heavily against application of the fair use doctrine to this case. Furthermore, it would be difficult to justify applying the doctrine of fair use to this case since Szarvas' reproduction was intended for the same use as the original. As stated by Leon Seltzer in his book Exemptions and Fair Use in Copyrights (1978) at page 24: "The list, casual or studied as it may be, reflects what in fact the subject matter of fair use has in the history of its adjudication consisted in: *it has always had to do with the use by a second author of a first author's work.* Fair use has not heretofore had to do with the mere reproduction of a work in order to use it for its intrinsic purpose—to make what might be called the 'ordinary' use of it. When copies are made for the work's 'ordinary' purposes, ordinary *infringement* has customarily been triggered, not notions of

fair use. (Italics in original.) (See also Nimmer, 3 Nimmer on Copyright, *supra,* § 13.05[B] at p. 13-70.)

Finally, Szarvas argues that the question of whether fair use applies is a question to be decided by the jury. Where the evidence clearly shows that fair use does not apply in a particular case, the trial court may decide this as a matter of law. (See *Marcus* v. *Rowley, supra,* 695 F.2d 1171, where the Court of Appeals for the Ninth Circuit reversed the district court's finding of fair use and entered summary judgment for the plaintiff.)

Since we find that the doctrine of fair use does not apply to this particular defendant, we do not reach the issue and express no opinion as to whether the doctrine of fair use could ever be a potential defense to prosecutions under Penal Code section 653h.

## II. *Mistake of Fact Regarding Consent*

■ Szarvas argues that the trial court erred by not instructing the jury *sua sponte* as to the defense of mistake of fact regarding the victim's consent. Szarvas' reliance on *People* v. *Mayberry* (1975) 15 Cal.3d 143 [125 Cal.Rptr. 745, 542 P.2d 1337] is misplaced. In *Mayberry,* the Supreme Court reversed convictions of rape and kidnaping due to the trial court's refusal to instruct the jury that they must acquit the defendant if they had a reasonable doubt as to whether the defendant reasonably and genuinely believed that the victim consented to her being taken to the defendant's apartment and to sexual intercourse with the defendant. In *People* v. *Hampton* (1981) 118 Cal.App.3d 324 [173 Cal.Rptr. 268], a case involving rape and unlawful oral copulation, the court held that a trial court must give the *Mayberry* instruction *sua sponte* where it appears that a defendant is relying on such defenses.

In the case at bench, the trial court instructed the jury on consent (CALJIC No. 1.23) and on mistake of fact (CALJIC No. 4.35). Defense counsel did not request, and the court did not give, a combined instruction dealing with mistake of fact regarding consent. Such an instruction was not required since *Mayberry* and its progeny do not apply to specific intent crimes. (*People* v. *Navarro* (1979) 99 Cal.App.3d Supp. 1 at p. 11 [160 Cal.Rptr. 692].)

Szarvas' mistaken belief as to consent might have some bearing on whether he had the requisite specific intent for the crimes charged. The jury was adequately instructed on the specific intent required for a conviction of each of the crimes charged. By its finding of guilt, the jury impliedly found the existence of such specific intent notwithstanding the evidence of such mistaken belief. (*People* v. *Vineberg* (1981) 125 Cal.App.3d 127, 136, fn. 6 [177 Cal.Rptr. 819].)

■ However, the sentence that was imposed for the petty theft conviction must be stayed due to Penal Code section 654 which states, in pertinent part, that: "[a]n act or omission which is made punishable in different ways by different provisions of this code may be punished under either of such provisions, but in no case can it be punished under more than one; . . ."

■ "The purpose of the protection against multiple punishment is to insure that the defendant's punishment will be commensurate with his criminal liability." (*Neal* v. *State of California* (1960) 55 Cal.2d 11, 20 [9 Cal.Rptr. 607, 357 P.2d 839].)

■ "The proscription against double punishment in section 654 is applicable where there is a course of conduct which violates more than one statute and comprises an indivisible transaction punishable under more than one statute within the meaning of section 654. The divisibility of a course of conduct depends upon the intent and objective to the actor, and if all the offenses are incident to one objective, the defendant may be punished for any of them but not for more than one." (*People* v. *Bauer* (1969) 1 Cal.3d 368, 376 [82 Cal.Rptr. 357, 461 P.2d 637, 37 A.L.R.3d 1398].)

■ In the case at bench, Szarvas' intent and objective was to sell the duplications of records for a profit. Szarvas' course of conduct is indivisible and therefore he may properly be punished for either the record piracy or the petty theft.

We recognize that an exception to the application of section 654 is made when there are multiple victims. (*People* v. *James* (1977) 19 Cal.3d 99, 119 [137 Cal.Rptr. 447, 561 P.2d 1135].) However, in the case at bench, while the information named numerous record companies as victims in count 6, the People have not cited us to any testimony which established that there were specifically identified victims, i.e., record companies named in count 6 who were not also named in counts 1 through 5. Detailed jury instructions were given concerning grand and petty theft. The jury found petty theft, i.e., a taking not exceeding $200 from a person [a record company]. The problem here was a failure of proof.

■ "Section 654 of the Penal Code prohibits double punishment, but it does not prohibit double conviction. Hence, conduct giving rise to more than one offense, within the meaning of the statute, may result in initial conviction of both crimes, only one of which, the more serious offense, may be punished. The appropriate procedure on appeal after the erroneous imposition of double punishment is to eliminate the effect of the judgment as to the lesser offense insofar as the penalty alone is concerned." (*People* v. *Hicks* (1965) 63 Cal.2d 764, 765-766 [48 Cal.Rptr. 139, 408 P.2d 747].)

■ We therefore stay execution of the sentence imposed for the conviction of petty theft pending the service of the sentence imposed for the conviction of Penal Code section 653h.

III. *The Testimony Regarding "Bootleg Recordings."*

■ Szarvas argues that the prejudicial effect of testimony regarding "bootleg records" was not cured by the court's admonishment to the jury to disregard all such testimony or evidence.

RIAA investigator, Kenneth Munson, testified that there were approximately 500-700 bootleg records seized from Szarvas' record store.

The trial court permitted such testimony pursuant to Evidence Code section 1101, subdivision (b)[3] for the limited purpose of showing Szarvas' state of mind as to Penal Code section 653h.

At the conclusion of the defendant's case, the trial court granted Szarvas' motion to strike all the testimonial and physical evidence concerning bootleg records stating that: "The reason the court granted the motion to strike the testimony and evidence concerning this term 'bootleg records' is that the court, based upon its understanding of the term, the number of records, total number of records and albums possessed by the defendant and the time period of his acquisition of these records and the subject matter of our present lawsuit concerning five counts of 653h of the Penal Code and one count of 487.1 of the Penal Code, finds that the probative value is far outweighed by its prejudicial effect and for that reason has granted the motion."

The trial court admonished the jury as follows: "Now, members of the jury panel, as you know certain evidence was introduced and certain references were made to this term bootleg records. I believe that has been not only presented during the course of the prosecution's case in chief, but in the examination of the—in the presentation of the defense.

"You are admonished that you are to disregard any testimony or any evidence that you have seen in this courtroom concerning this term 'bootleg records.'

"That is simply whatever notes that you have concerning bootleg records you will strike that from your notes and strike that from your mind as if this term you had heard—heard nothing of it or the item. I know that's going to be hard to do, but I'm sure that in your deliberations in this case, that you can do that.

---

[3]Evidence Code section 1101, subdivision (b) states: "Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident) other than his disposition to commit such acts."

"Even though you may want to consider that, I would ask you and you are ordered at this time to disregard that testimony and simply treat it as if you had never heard it in this courtroom. That's all reference to this term 'bootleg records.'"

Szarvas' reliance on *People* v. *Roof* (1963) 216 Cal.App.2d 222 [30 Cal.Rptr. 619] is misplaced. In *Roof,* the defendant was charged with grand theft. A witness testified that the defendant stated he had earlier been charged with contributing to the delinquency of a minor. The court, at pages 225-226, stated: "[I]t is, of course, well recognized that facts that have been impressed upon the minds of jurors which are calculated to materially influence their consideration of the issues cannot be forgotten or dismissed at the mere direction of a court. Among the facts which are generally considered to be incapable of obliteration from the minds of the jurors by the court's direction is the fact that the accused has been previously charged with or convicted of a crime. (*People* v. *Ozuna,* 213 Cal.App.2d 338 [28 Cal.Rptr. 663] and cases cited.)"

However, in the case at bench, the testimony only related to possession of bootleg records. This is quite different from the risk of prejudicing the jurors' minds with evidence of a prior crime.

Regarding the effectiveness of admonishing a jury, the court in *People* v. *Duncan* (1960) 53 Cal.2d 803, 818 [3 Cal.Rptr. 351, 350 P.2d 103], stated: "[A]lthough it is not always possible to cure error in this manner, for example, where the objectionable evidence goes to the main issue and the proof of guilt is not clear and convincing, the jury, under ordinary circumstances, is presumed to obey the court's instructions and disregard the evidence. (*People* v. *Hardy,* 33 Cal.2d 52, 61-62 [198 P.2d 865].)"

In the case at bench, proof of Szarvas' guilt was clear and convincing. Szarvas testified that he received money for the duplication of records. His defense was that he thought he had the implied consent of the victims (the record companies).

Thus, assuming arguendo that the jury did not disregard the testimony regarding bootleg records, this would not have prejudiced the jurors' minds into thinking Szarvas had committed the acts charged, since his own testimony and that of a majority of his witnesses, admitted that he duplicated records for a fee. We therefore conclude that the court's admonishment to the jury cured any prejudice created by the testimony concerning bootleg records.

IV. *Agent Romanoff's Testimony*

■ Szarvas argues that the trial court erred in permitting FBI agent Edward Romanoff give his opinion as to what constitutes record piracy. Szarvas claims

this testimony went to an ultimate issue of the case and thereby invaded "the function of the jury as the trier of fact." Our review of the record reveals that Szarvas' contentions are incorrect since Romanoff's testimony related solely to the Federal Copyright Act and not Penal Code section 653h. The fact that the jury had Romanoff's testimony reread to them indicates that there should have been no misconception that Romanoff's testimony related solely to the Federal Copyright Act.

## V. *Effective Assistance of Counsel*

Szarvas argues that he was denied the effective assistance of counsel due to two omissions on the part of his attorney. The first omission complained of was a failure to request a mistrial after RIAA Investigator Munson's testimony regarding Szarvas' possession of bootleg records. The second omission complained of was a failure to request jury instructions addressing the defense of a mistake of fact regarding the victim's consent.

In a criminal case, the defendant's right of effective assistance of counsel is guaranteed under both the United States and California Constitutions.[4]

"Of course, the burden of proving a claim of inadequate trial assistance is on the appellant." (*People* v. *Camden* (1976) 16 Cal.3d 808 at p. 816 [129 Cal.Rptr. 438, 548 P.2d 1110].) Thus, appellant must show that trial counsel failed to act in a manner to be expected of reasonably competent attorneys acting as diligent advocates. In addition, appellant must establish that counsel's acts or omissions resulted in the withdrawal of a potentially meritorious defense.

"Once an appellant has met these burdens, the appellate court must look to see if the record contains any explanation for the challenged aspect of representation. If it does, the court must inquire whether the explanation demonstrates that counsel was reasonably competent and acting as a conscientious, diligent advocate. For example, where the record shows that counsel's omissions resulted from an informed tactical choice within the range of reasonable competence, the conviction must be affirmed. (E.g., *People* v. *Fain* (1969) 70 Cal.2d 588, 600 [75 Cal.Rptr. 633, 451 P.2d 65].) In contrast, where the record shows that counsel has failed to research the law or investigate the facts in the manner of a diligent and conscientious advocate, the conviction should be reversed since the defendant has been deprived of adequate assistance of counsel. (E.g., *People* v. *McDowell* (1968) 69 Cal.2d 737 [73 Cal.Rptr. 1, 447 P.2d 97].)" (*People* v. *Pope* (1979) 23 Cal.3d 412, 425-426 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1].)

---

[4] United States Constitution, Amendment VI; California Constitution, article I, section 15.

In *People* v. *Guillebeau* (1980) 107 Cal.App.3d 531 [166 Cal.Rptr. 45], the court, at pages 547-548, stated: "The legal principles relating to a motion for a mistrial are well settled. To start with, a motion for a mistrial presupposes that the effect of the objectionable evidence 'is so prejudicial as to be incurable by striking it and admonishing the jury to disregard it. In other words, a motion to strike presupposes error of some sort, whereas the motion for mistrial presupposes error plus incurable prejudice.' (*People* v. *Woodberry* (1970) 10 Cal.App.3d 695, 708 [89 Cal.Rptr. 330].) Moreover, it is widely recognized that a motion for a mistrial is addressed to the sound discretion of the trial court and it may be properly refused where the court is satisfied that no injustice has resulted from the occurrences of which the party complains. (*People* v. *Romero* (1977) 68 Cal.App.3d 543, 548 [137 Cal.Rptr. 675]; *People* v. *Slocum* (1975) 52 Cal.App.3d 867, 884 [125 Cal.Rptr. 442]; *People* v. *Ray* (1967) 252 Cal.App.2d 932, 962 [61 Cal.Rptr. 1].)"

 As we have stated in section III of this opinion, Munson's testimony was not incurably prejudicial. Any prejudice that may have arisen was cured by the court's admonishment to the jury. Therefore, a motion for a mistrial would have been improper.

As we have stated in section II of this opinion, a combined jury instruction dealing with mistake of fact regarding the victim's consent was not required. Thus, counsel's failure to request such an instruction did not amount to ineffective assistance of counsel.

We therefore conclude that Szarvas was not denied the effective assistance of counsel.

### DISPOSITION

The convictions under Penal Code section 653h, subdivision (a)(1) (counts I through V) are affirmed. The conviction under Penal Code section 484 (count VI) is stayed, pending service of the sentence on counts I through V; after completion of that sentence, the stay is permanent. As modified, the judgments of conviction on all counts are affirmed.

Dalsimer, J., and Disco, J.,* concurred.

Petitions for a rehearing were denied May 26, 1983, and the opinion was modified to read as printed above. Appellant's petition for a hearing by the Supreme Court was denied June 29, 1983.

---

*Assigned by the Chairperson of the Judicial Council.