[No. B003717. Second Dist., Div. Seven. Dec. 18, 1985.]

THE PEOPLE, Plaintiff and Respondent, v.
WILLIE HARRIS et al., Defendants and Appellants.

[No. B010462. Second Dist., Div. Seven. Dec. 18, 1985.]

In re JEAN PIERRE THOMAS on Habeas Corpus.

COUNSEL

John Alan Cohan and Frank O. Bell, Jr., State Public Defender, under appointments by the Court of Appeal, and Richard Avila, Deputy State Public Defender, for Defendants and Appellants and Petitioner.

John K. Van de Kamp, Attorney General, Donald F. Roeschke and Donald J. Oeser, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

POUNDERS, J.*—Following trial by jury, both defendants were found guilty of murder in the first degree in violation of Penal Code section 187, the jury further finding as to defendant Thomas that he personally used a firearm in violation of Penal Code sections 12022.5 and 1203.06, subdivision (a)(1), and as to defendant Harris that he was a principal in the offense and was armed with a firearm, a handgun, within the meaning of Penal Code section 12022, subdivision (a).

Defendant Thomas advances numerous contentions in his appeal and his petition for writ of habeas corpus, which we consider concurrently with this appeal. He challenges instructions given on aiding and abetting, express and implied malice, the definition of malice, and the second degree felony murder rule. He alleges that other instructions should have been given, including those requiring that the jurors elect which act they based their determination upon, the necessity to corroborate accomplices, and advice that the jury might reach a partial verdict on the greater offense. Finally, defendant Thomas objects to the admissibility of evidence of gang membership, the sufficiency of the evidence to support the conviction, and the competency of his trial counsel.

Defendant Harris also challenges the admissibility of the evidence of gang membership as well as his 26 years to life sentence as being cruel and unusual punishment and disproportionate to that received by the codefendant.

STATEMENT OF FACTS

"The Death of Deaf John"

On the evening of April 6, 1983, Ms. Mary Jackson was driving with three friends eastbound toward her home at approximately 744 Colden when

---

*Assigned by the Chairperson of the Judicial Council.

she heard two shots. She proceeded in the same direction and within a minute saw two men running westbound and therefore facing her. These two men were the defendants, both of whom she had seen before. She had seen "Boo," defendant Harris, around the neighborhood too many times to count. She knew defendant Thomas as "Powerful Pierre" and had seen him on prior occasions also.

Ms. Jackson had also known Basil Calvert, known as Deaf John, for approximately six months. He was deaf, but he could speak and read lips. Just after the shooting, she saw him stepping away from an apartment building and out into the street. He was staggering and fell face down. When Ms. Jackson got to the victim, he appeared to be alive, but he closed his eyes and died. Both his eyeglasses and his hearing aid were missing.

When Ms. Jackson had first seen the defendants, they were two yards from the victim's position, already in full stride running. Defendant Harris had a gun. Three or four men standing in the area next to a building did not run away.

Earlier that evening between 7:30 and 8 p.m. 19-year-old Lawrence Bradley had seen defendant Harris, who had said that he was "going to do a jack." That meant that he was going to rob people. At about 8 p.m., defendant Thomas came to Delitha Crain's house looking for defendant Harris, who was Ms. Crain's boyfriend.

Later that night Mr. Bradley saw defendant Harris with someone else on Colden, a great distance away. As Mr. Bradley was walking down the street, defendant Harris asked whether he knew a "deaf man." The deaf man was coming up some stairs as Mr. Bradley walked past him. Defendant Harris then "socked" the man, whose glasses flew off, and he fell. The deaf man tried to say something when Mr. Bradley heard two shots and saw defendant Harris shoot the victim. Mr. Bradley ran, and then the police arrived. Mr. Bradley did not see the man with defendant Harris do anything.

At the time of trial Robert Stringer, also known as "Monster," refused to answer most of the questions put to him.[1] Thereafter Mr. Stringer was

---

[1]Mr. Stringer failed to answer questions as to his knowledge about defendant Harris, whether he understood the questions, and whether he wanted to testify. When instructed to answer the questions, Mr. Stringer stated that he had heard the questions. The following

impeached with a prior statement made to Detective Eide on April 27, 1983, in which he indicated that he had known Boo for about 10 years; that on the night Deaf John was killed Mr. Stringer was visiting a girlfriend on Colden and defendant Harris arrived there at 7 o'clock; that he observed Deaf John by the front of the parking lot when defendant Harris went up to him and they started talking in sign language; that he saw Deaf John hand defendant Harris some money; and that defendant Harris stepped back a couple of steps and shot the victim.

Robert Stringer further stated to the detective that the next day defendant Harris came by the house and said that he had shot the victim; that Mr. Stringer told him it was stupid because there were so many people who saw it; and that defendant Harris indicated that he did not care as long as "nobody snitched." Mr. Stringer also commented that defendant Harris had a .25 caliber automatic for a year.

---

then ensued:

"Q. By Mr. McLaughlin [Prosecutor]: Robert, do you want to testify here today?
"A. (No audible response.)
"THE COURT: You have to answer yes or no.
"THE WITNESS: No.
"Q. By Mr. McLaughlin: Why not?
"A. Because I just don't want to.
"Q. Are you afraid?
"A. No.
"Q. Why don't you want to testify?
"A. Because I just don't. I told you yesterday, too.
"Q. Okay.
"Do you remember talking to the police about the murder of Basil Calvert?
"A. (No audible response.)
". . . . . . . . . . . . . . . . . . . . . . .
"Q. Were you around the location of 744 West Colden Avenue in Los Angeles on April 6, 1983?
"A. I don't want to say.
"Q. Well, were you or weren't you?
"A. I told you I don't want to say.
". . . . . . . . . . . . . . . . . . . . . . .
"Q. [By Mr. McLaughlin]: On April 27, 1983, did you tell Detective Eide that you saw Deaf John hand Boo some money, and then Boo stepped back a couple of steps and shot Deaf John.
"A. I don't remember.
"Q. Did you also tell Detective Eide that Boo had a .25 caliber automatic pistol for over a year?
"A. I can't remember.
"Q. Did you also tell Detective Eide that Deaf John gave Pierre some money, Boo then socked Deaf John?
"A. I can't remember.
"Q. Deaf John staggered back, and then Pierre went up and shot the deaf man twice?
"A. I can't remember.
"Q. Did you also tell him that Boo and Pierre both had guns?
"A. No."

On April 28, 1983, Detective Eide had a conversation with Robert Stringer at his house, at which time he stated that he saw the victim in front of 744 West Colden and saw both defendants go up to him; that the victim talked in sign language and gave defendant *Thomas* some money; that at this point defendant Harris "socked Deaf John" and the victim staggered back; that defendant *Thomas* shot the victim twice with what sounded like a .25 caliber gun; and that both defendants had guns.

Mr. Stringer further stated he knew that both defendants were with the 107th Hoover Crips, a local gang, and that is why he lied about what he saw. He was afraid to testify. He did not want their friends coming around after him and his family. He said that he was telling the truth because his brothers and family had told him to tell the truth and not to be afraid. In subsequent conversations Mr. Stringer told the detective that he was afraid to testify because defendants would shoot up his mother's house if he did.

Sometime after the shooting, Delitha Crain returned to her house. Both defendants approached her, and she said that a man got killed on Colden. Defendant Harris said to defendant Thomas, " 'A man got killed on Colden. A man got killed.' " Defendant Thomas said, " 'So,' " and laughed. She said, " 'That ain't funny. You wouldn't be laughing if you go to jail.' " Then defendant Harris told her that defendant Thomas shot the victim.

After defendant Harris was taken into custody, he stated to Detective Monica Rhodes of the Los Angeles Police that he knew who had shot the victim and would make a telephone call to prove it. Thereafter Detective Rhodes and Detective Eide overheard and tape-recorded a conversation between defendant Harris and defendant Thomas at which time defendant Harris said, " 'They got me down for that man. I talked to the detectives. Hey, man, check this out. How many times you [*sic*] shoot that nigger?' " Defendant Thomas replied, " 'I think once. I don't know. I don't know. I ain't talking on the phone.' " Defendant Harris then said, " 'This guy named Pookie say [*sic*] you went and shot the deaf man. He said I had a Roscoe and shot that man.' " Defendant Thomas stated, " 'You know you didn't do it.' " He further stated that he would "try to get these niggers not to snitch and take care of things on the street."

On April 27, Tommie Delores Harris, defendant Harris' mother, had a conversation with defendant Thomas at her home. She asked defendant Thomas whether he shot the deaf man, and he said, " 'Yes.' "

## DISCUSSION

### I

### *Beeman Instructional Error*

Subsequent to defendants' convictions in this case, our Supreme Court determined in *People* v. *Beeman* (1984) 35 Cal.3d 547, 560 [199 Cal.Rptr. 60, 674 P.2d 1318], that CALJIC No. 3.01 erroneously defined aiding and abetting by failing to adequately inform the jury of the criminal intent required to convict a defendant as an aider and abettor of the crime. Later, our Supreme Court determined in *People* v. *Caldwell* (1984) 36 Cal.3d 210 [203 Cal.Rptr. 433, 681 P.2d 274], that CALJIC No. 3.00 is also defective in failing to correctly inform the jury of the requisite intent for aiding and abetting. As his first argument in a lengthy pursuit[2] of reversal, defendant Thomas raises *Beeman* error.

The issue of the retroactivity of *Beeman* has been settled in a number of opinions based on the fact that the decision resolved conflicts in lower court opinions, requiring retrospective operation. (*People* v. *Olmedo* (1985) 167 Cal.App.3d 1085, 1091 [213 Cal.Rptr. 742]; *People* v. *Henderson* (1985) 163 Cal.App.3d 1001, 1010 [209 Cal.Rptr. 883]; *People* v. *Minichilli* (1984) 161 Cal.App.3d 660, 669-670 [207 Cal.Rptr. 766]; *People* v. *Tovar* (1984) 161 Cal.App.3d 137, 142-143 [207 Cal.Rptr. 255]; *People* v. *Gilman* (1984) 156 Cal.App.3d 760, 765 [203 Cal.Rptr. 6].)

■ In the absence of further illumination from our Supreme Court, the courts of appeal have found that the standard of prejudice for *Beeman* error is to be applied as did our Supreme Court in *People* v. *Garcia* (1984) 36 Cal.3d 539, 549-558 [205 Cal.Rptr. 265, 684 P.2d 826]. The *Garcia* exceptions to a rule of per se reversal were later detailed in *People* v. *Ramos* (1984) 37 Cal.3d 136, 146-147 [207 Cal.Rptr. 800, 689 P.2d 430]: (1) if the erroneous instruction was given in connection with an offense for which the defendant was acquitted and if the instruction had no bearing on the offense for which he was convicted, (2) if the defendant conceded the issue of intent, (3) if the factual question posed by the omitted instruction was necessarily resolved adversely to the defendant under other properly given instructions, and (4) where the parties recognized that intent was an issue, presented all evidence at their command on that issue, and the record not only established the necessary intent as a matter of law but also showed the

---

[2]Defendant Thomas filed three briefs in addition to the petition for writ of habeas corpus, the total amounting to 145 pages covering 14 issues. The trial transcript is only 362 pages in length.

contrary evidence not worthy of consideration. (See also *People* v. *Olmedo, supra,* 167 Cal.App.3d at p. 1093.)

■    The evidence and the arguments in the instant case disclose that at least the fourth exception applies here. Defendant Thomas presented no evidence in his defense but depended instead on conflicts in the People's case to establish reasonable doubt. The only eyewitnesses to testify, Mr. Bradley and Mr. Stringer, identified codefendant Harris as the shooter. Mr. Bradley failed to identify defendant Thomas as the second man and was definite in his testimony that the second man did nothing to aid the shooter. In argument to the jury, defense counsel insisted that only Mr. Bradley was telling the truth. If accepted by the jury, Mr. Bradley's testimony established defendant Thomas' innocence by negating both the act and the intent necessary to find aiding and abetting. All of the remaining evidence proved that defendant Thomas was the shooter. Mr. Stringer's final statement to the police, and defendant Thomas' admissions to Mrs. Harris and Ms. Crain, were anchored by the tape-recorded admission monitored by the police. We therefore conclude that defendant Thomas recognized that both the act and the intent necessary to establish aiding and abetting were in issue, that all the available evidence was submitted to the jury, and that the jury rejected the defense on both issues. The *Beeman* error was not prejudicial.

## II

### *The Election Theory*

In the following two arguments, defendant Thomas asserts that the court erred in instructing on express malice, implied malice, and the felony murder rule where the prosecutor argued that the perpetrator of the murder acted with specific intent to kill. He further contends that the court had a *sua sponte* duty to instruct the jury to agree unanimously on which combination of acts it found sufficient to support a finding of first degree murder.

On close analysis these two arguments amount to an assertion that the court must instruct the jury to agree on the theory upon which it convicts and the specific acts upon which it convicts. These arguments are without support in statutory or case law.

■    It has long been held that "in a prosecution for first degree murder it is not necessary that all jurors agree on one or more of several theories proposed by the prosecution; it is sufficient that each juror is convinced beyond a reasonable doubt that the defendant is guilty of first degree murder as that offense is defined by the statute." (*People* v. *Milan* (1973) 9 Cal.3d 185, 194-195 [107 Cal.Rptr. 68, 507 P.2d 956]; *People* v. *Chavez* (1951)

37 Cal.2d 656, 670-672 [234 P.2d 632]; *People* v. *Nicholas* (1980) 112 Cal.App.3d 249, 273 [169 Cal.Rptr. 497].)

Defendant Thomas' reliance upon *People* v. *Murtishaw* (1981) 29 Cal.3d 733, 764-765 [175 Cal.Rptr. 738, 631 P.2d 446], is unavailing. Our Supreme Court there concluded that the particular instructions given on assault with intent to commit murder were contradictory, the trial court having defined the mental element essential to the crime in two different ways—intent to kill and intent to murder. Furthermore, the court found that these contradictory instructions did not give rise to prejudicial error. (*Id.,* at pp. 762-764.)

His argument for an instruction requiring unanimous agreement on which combination of acts amounted to first degree murder is similarly flawed. He relies upon cases such as *People* v. *Diedrich* (1982) 31 Cal.3d 263, 281 [182 Cal.Rptr. 354, 643 P.2d 971], and *People* v. *Madden* (1981) 116 Cal.App.3d 212, 218 [171 Cal.Rptr. 897], which are distinguishable. As illuminated in the discussion in *People* v. *Dunnahoo* (1984) 152 Cal.App.3d 561, 568-570 [199 Cal.Rptr. 796], these cases invoke the "doctrine of election" when the evidence produced in the case establishes *several acts,* any one of which could constitute the crime charged.

Defendant Thomas claims that *People* v. *Espinoza* (1983) 140 Cal.App.3d 564, 568 [189 Cal.Rptr. 543], is identical to the present situation. It is evident, however, that again the *Espinoza* case deals with evidence which establishes "three factual bases for an assault with a deadly weapon conviction," requiring that the jury agree upon the same act as the basis for the conviction. In contrast, the facts here establish only one act of homicide, accomplished by the rapid infliction of two gunshot wounds. Accordingly, the election doctrine does not apply.[3]

## III

### *Sua Sponte Instructions on Corroboration of Accomplice Testimony*

In order to establish that an individual is an accomplice, a defendant bears the burden of producing evidence raising that issue and must prove the accomplice status by a preponderance of the evidence. (*People* v. *Belton* (1979) 23 Cal.3d 516, 523 [153 Cal.Rptr. 195, 591 P.2d 485]; *People* v. *Tewksbury* (1976) 15 Cal.3d 953, 968 [127 Cal.Rptr. 135, 544 P.2d 1335].)

---

[3]The recent case of *People* v. *Potts* (Cal.App.), which tends to support defendant's view, was ordered depublished on May 30, 1985.

Having failed to either argue to the jury that they were accomplices or to request an accomplice instruction from the court, defendant Thomas now argues that the court should have instructed *sua sponte* as to the need to corroborate accomplice testimony from codefendant Harris, Mr. Stringer, Ms. Crain, and Mr. Bradley.

It is immediately evident, however, that codefendant Harris did not testify, thereby negating the need for accomplice instructions as to his testimony. A few of the statements made by codefendant Harris prior to the trial were related by other witnesses, but this evidence was limited by the court to codefendant Harris alone. Specifically, Mr. Bradley's narration of the events leading up to the shooting as to codefendant Harris' intent to commit a robbery and the shooting of the victim were strictly limited by the court. Similarly, the conversation between codefendant Harris and Detective Eide was limited to consideration against codefendant Harris alone.

It is also true that, contrary to defendant Thomas' assertions on appeal, Mr. Bradley was neither arrested for, nor accused of, the killing of Deaf John. He testified that he was taken into custody for failure to respond to subpoenas to testify in the instant case. Mr. Bradley's testimony was insufficient to accuse defendant Thomas of any offense or to suggest that he himself was an accomplice. He did not see codefendant Harris' companion do anything. Furthermore, defendant Thomas' trial counsel relied entirely on Mr. Bradley's testimony to raise a reasonable doubt as to his guilt.

Ms. Crain testified concerning defendants' presence together on the night of the offense and later concerning defendant Thomas' admission that he shot the victim. Although taken into custody for questioning, she was not arrested. Her testimony neither placed her at the scene of the offense nor in conspiracy with either defendant in accomplishing the robbery or homicide. Although defendant Thomas notes that Mr. Stringer testified that Ms. Crain was next to him when the incident happened, mere presence at the scene of the offense is not sufficient to make one an accomplice. (*People* v. *Strickland* (1974) 11 Cal.3d 946, 958 [114 Cal.Rptr. 632, 523 P.2d 672]; *People* v. *Williams* (1970) 10 Cal.App.3d 638, 641 [89 Cal.Rptr. 143].)

Of the four witnesses named by defendant Thomas as being possible accomplices, Mr. Stringer perhaps came the closest. He had been arrested as a suspect. In his out-of-court statements, he placed both defendants at the scene of the offenses and accused each of having been the shooter. His recalcitrant conduct in court led to the admission of his extrajudicial statements. Even out-of-court statements are sufficient to establish that a witness is an accomplice requiring corroboration by independent evidence. (*People* v. *Belton, supra,* 23 Cal.3d at pp. 524-525; *People* v. *Pic'l* (1981) 114

Cal.App.3d 824, 873-874 [171 Cal.Rptr. 106].) Mr. Stringer's prior statements to the police established that he was an eyewitness to the homicide, but there was no indication from any source that he in any way participated in the offenses.

■ Where, as here, there is no evidence that would conceivably make any of the witnesses who testified liable for the "identical offense" for which defendant Thomas was being prosecuted, they were not accomplices as a matter of law and no instruction requiring corroboration was necessary. (*People* v. *Gordon* (1973) 10 Cal.3d 460, 468-469 [110 Cal.Rptr. 906, 516 P.2d 298]; *People* v. *Cooper* (1970) 10 Cal.App.3d 96, 102-103 [88 Cal.Rptr. 919]; *People* v. *Bejarano* (1981) 114 Cal.App.3d 693, 700-701 [173 Cal.Rptr. 71].)

IV

*Court Instructions on CALJIC Nos. 8.11 and 8.31*

Confusing both the law and the instructions in this case, defendant Thomas challenges the giving of CALJIC No. 8.10 that a murder is complete when the killing is done with malice aforethought, CALJIC No. 8.11 on "malice aforethought" defined and CALJIC No. 8.31 on second degree murder; defendant Thomas further argues that CALJIC No. 8.31 was erroneous in its omission of language recommended in *People* v. *Watson* (1981) 30 Cal.3d 290, 296-297 [179 Cal.Rptr. 43, 637 P.2d 279].

Defendant Thomas' central attack is that the instructions "enabled the jury to equate 'a wanton disregard for human life' with 'an awareness of a duty imposed by law not to commit such acts,' and thus to convict the accused based on the belief in his knowledge or 'awareness' of the law and not on his awareness of the danger to life posed by his conduct." The basic flaw in this argument is that defendant Thomas quotes from the 1974 revision of CALJIC No. 8.31 rather than the 1981 version which was actually given. The 1974 version states:

"Murder of the second degree is also the unlawful killing of a human being as the direct causal result of an act involving a high degree of probability that it will result in death, which act is done for a base, antisocial purpose and with wanton disregard for human life *by which is meant an awareness of a duty imposed by law not to commit such acts followed by the commission of the forbidden act despite that awareness.*

"When the killing is the direct result of such an act, it is not necessary to establish that the defendant intended that his act would result in the death of a human being." (Italics added.)

The 1981 revision, which was given by the trial court here, inserts the word "intentional" before the word "act" in each paragraph and further deletes from the end of the first paragraph the language "by which is meant an awareness of a duty," such language further defining wanton disregard for human life. Since the offending instruction was not given, there was no error.

Defendant Thomas further argues that CALJIC No. 8.31 was erroneous in its failure to include the language recommended in *People v. Watson, supra,* 30 Cal.3d at pages 296-297, that malice may be implied when a person, knowing that his conduct endangers the life of another, nonetheless acts deliberately with conscious disregard for life. That language is now a part of the 1983 revision of CALJIC No. 8.31, but its effect is to allow the charging of a homicide which occurs during the operation of a motor vehicle as second degree murder rather than vehicular manslaughter. (*People v. Watson, supra,* at pp. 295-299.) This language, of course, has no application to the instant case. There was no error.

## V

### *CALJIC No. 1.22 Defining Malice*

■ Defendant Thomas correctly asserts that it was error for the trial court to have instructed CALJIC No. 1.22, as requested by the People, which provides: "The words 'malice' and 'maliciously' mean a wish to vex, annoy, or injure another person, or an intent to do a wrongful act." However, the error is uniformly ruled to be harmless where the court also instructs on "malice aforethought," as defined in Penal Code section 188[4] and embodied in CALJIC No. 8.11, which was given here. (*People v. Price* (1965) 63 Cal.2d 370, 374 [46 Cal.Rptr. 775, 406 P.2d 55]; *People v. Chavez, supra,* 37 Cal.2d at pp. 666-667.)

## VI

### *CALJIC No. 8.75 on a Partial Verdict on the Greater Offense*

Citing *Stone v. Superior Court* (1982) 31 Cal.3d 503 [183 Cal.Rptr. 647, 646 P.2d 809], defendant Thomas urges that the court should have instruct-

---

[4]Penal Code section 188 provides as follows:

"Such malice may be express or implied. It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature. It is implied, when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart.

"When it is shown that the killing resulted from the intentional doing of an act with express or implied malice as defined above, no other mental state need be shown to establish the mental state of malice aforethought. Neither an awareness of the obligation to act within the general body of laws regulating society nor acting despite such awareness is included within the definition of malice."

ed pursuant to CALJIC No. 8.75, which would allow the jury to acquit on a greater offense when the jury is deadlocked only as to an uncharged lesser included offense. Our Supreme Court also recommended, however, an alternate procedure whereby the trial court may decide to wait to determine whether the jury is unable to reach a verdict, whereupon the court should then inquire whether the jury has been able to eliminate any offense. (*Stone* v. *Superior Court, supra,* at p. 519.)

There was no deadlock here. The jury found both defendants guilty of first degree murder as charged. There was no error.

### VII

### *Admissibility of Gang Membership*

Relying upon *People* v. *Cardenas* (1982) 31 Cal.3d 897, 904-905 [184 Cal.Rptr. 165, 647 P.2d 569], both defendants contend that it was error to admit evidence that the defendants were affiliated with a youth gang. Defendants fail to recognize, however, that in *Cardenas* only three justices concluded that the admission of such evidence constituted error and thus this conclusion lacks precedential authority. (*Farrell* v. *Board of Trustees* (1890) 85 Cal. 408, 415-416 [24 P. 868]; *In Re Williams* (1977) 69 Cal.App.3d 840, 843 [138 Cal.Rptr. 384].)

█ It is clear that membership in a gang is admissible evidence on a number of issues in a criminal trial. (See *Williams* v. *Superior Court* (1984) 36 Cal.3d 441, 450, fn. 8 [204 Cal.Rptr. 700, 683 P.2d 699]; *People* v. *Contreras* (1983) 144 Cal.App.3d 749, 756-757 [192 Cal.Rptr. 810]; *People* v. *Frausto* (1982) 135 Cal.App.3d 129, 140-141 [185 Cal.Rptr. 314]; *People* v. *Munoz* (1984) 157 Cal.App.3d 999, 1012-1013 [204 Cal.Rptr. 271].) Under the facts of this case, evidence of gang membership was relevant on possible threats to prosecution witnesses, resulting in obvious bias during testimony. (See *People* v. *Green* (1980) 27 Cal.3d 1, 19-20 [164 Cal.Rptr. 1, 609 P.2d 468]; *People* v. *Brooks* (1979) 88 Cal.App.3d 180, 185-187 [151 Cal.Rptr. 606].)

Robert Stringer took the stand and essentially refused to testify, either failing to respond to questions or stating that he could not remember the answers. Although he testified that he was afraid of no one, he had earlier told the detectives that he was afraid to testify because the defendants would shoot up his mother's house if he did. The trial court specifically and correctly found the evidence of gang membership to be admissible on the issue of credibility.

Defendant Harris further brands as ineffective the court's admonition to the jury to disregard Detective Eide's statement that he was known as a "shooter" for the Crips. We conclude that the jury followed the admonition not to consider the stricken statement. (*People* v. *Duncan* (1960) 53 Cal.2d 803, 818 [3 Cal.Rptr. 351, 350 P.2d 103]; *People* v. *Szarvas* (1983) 142 Cal.App.3d 511, 524 [191 Cal.Rptr. 117].) Overwhelming evidence pointed to defendant Thomas as the shooter.

## VIII

### *Sufficiency of the Evidence*

■ Defendant Thomas challenges the sufficiency of the evidence to support the verdict of first degree murder on either the theory of premeditation and deliberation or felony murder. To the contrary, viewed in the light most favorable to the judgment (*People* v. *Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738]), the evidence against defendant Thomas is overwhelming.

Basil Calvert died of a gunshot wound to the chest. Robert Stringer, an eyewitness to the shooting, stated that defendant Thomas shot the victim twice after the victim gave up some money under circumstances that did not suggest a loan. Mary Jackson, an unbiased resident of the neighborhood, identified both defendants as having run from the immediate scene of the shooting. In a telephone conversation with defendant Harris which, unknown to defendant Thomas, was monitored and recorded by the police, defendant Thomas admitted that he shot the victim and that defendant Harris did not. Similar admissions were made to Mrs. Harris and Ms. Crain. This evidence was devastating. (See *People* v. *Jiminez* (1978) 21 Cal.3d 595, 607 [147 Cal.Rptr. 172, 580 P.2d 672].)

## IX

### *Competency of Trial Counsel*

In both his petition for writ of habeas corpus and his appeal, defendant Thomas attacks the competency of his trial counsel under *People* v. *Pope* (1979) 23 Cal.3d 412, 423-424 [152 Cal.Rptr. 732, 590 P.2d 859]. Defendant Thomas contends that Mary Jackson's courtroom identification of defendant Thomas was an impermissibly suggestive one-person showup which should have been challenged by trial counsel.

Recognizing that Mary Jackson was familiar with both defendants prior to the incident, defendant Thomas' argument is unpersuasive. She had seen

both defendants a number of times in the neighborhood. The courtroom confrontation could not have been suggestive. Accordingly, there appears no reason to insist upon a pretrial lineup to establish the competency of defense counsel. (See *People* v. *Breckenridge* (1975) 52 Cal.App.3d 913, 935-936 [125 Cal.Rptr. 425].)

In his supplemental brief, defendant Thomas argues that trial counsel was incompetent for failure to challenge the admissibility of codefendant Harris' extrajudicial statements implicating defendant Thomas in the crime. The argument fails to recognize that codefendant Harris' extrajudicial statements were limited in their admissibility to the case against codefendant Harris alone. The only statements made by codefendant Harris admitted against defendant Thomas were in the form of an adoptive admission—while codefendant Harris was still in custody he called defendant Thomas and the conversation was monitored and tape-recorded with codefendant Harris' consent. Defendant Thomas' responses to defendant Harris' statements implicating him in the robbery-homicide specifically admitted the fact that he was the shooter and defendant Harris was not. This admission would have been admissible against defendant Thomas even in separate trials. (*People* v. *Pic'l, supra,* 114 Cal.App.3d 824, 858, 860; *People* v. *Williams* (1982) 128 Cal.App.3d 981, 987 [180 Cal.Rptr. 734].)

Defendant Thomas' argument that the admission of this conversation violated his rights under *People* v. *Aranda* (1965) 63 Cal.2d 518 [47 Cal.Rptr. 353, 407 P.2d 265], is misplaced. That case involved the admissibility of an extrajudicial statement one defendant made to *a third party* which implicated a codefendant. (*People* v. *Preston* (1973) 9 Cal.3d 308, 313-314 [107 Cal.Rptr. 300, 508 P.2d 300]; *People* v. *Williams, supra,* 128 Cal.App.3d at p. 987.)

Defendant Thomas' next attack on the competency of his trial counsel relates to an alleged failure to make a formal discovery request. As he suggests, defendant Thomas apparently received informal discovery, including such items as Mr. Bradley's PCP conviction. ■ More importantly, pursuit of informal discovery arrangements in lieu of formal discovery does not amount to incompetency of trial counsel. (*People* v. *Jackson* (1980) 28 Cal.3d 264, 291 [168 Cal.Rptr. 603, 618 P.2d 149]; *People* v. *Bess* (1984) 153 Cal.App.3d 1053, 1058 [200 Cal.Rptr. 773].)

As defendant Thomas acknowledges, his third argument with regard to counsel's decision not to challenge a possibly illegal detention of Delitha Crain is foreclosed by the recent decision of the California Supreme Court in *In re Lance W.* (1985) 37 Cal.3d 873, 879, 896 [210 Cal.Rptr. 631, 694 P.2d 744]. The vicarious exclusionary rule is no longer in effect.

Finally, defendant Thomas' allegation in his petition for writ of habeas corpus that counsel was incompetent for failure to move to sever the trials of the codefendants or to delete codefendant Harris' statement meets the same fate as his argument on the appeal. The extrajudicial statements of codefendant Harris were admitted against himself alone except as to the portion of the conversation between codefendant Harris and defendant Thomas in which defendant Thomas admitted he was the shooter and defendant Harris was not.

## X

### *The Allegation of Firearms Use*

Defendant Thomas' final argument is that the jury erred in finding that the codefendants both personally used a firearm under Penal Code section 12022.5. The short answer to this contention is that the jury did not so find. Defendant Thomas was found to have *used* a firearm, a handgun, within the meaning of Penal Code sections 12022.5 and 1203.06, subdivision (a)(1). Codefendant Harris was found to have been *armed* with a firearm, a handgun, within the meaning of Penal Code section 12022, subdivision (a).

Defendant Thomas further erroneously contends that "there was no evidence introduced that more than one gun was used." Robert Stringer's statement to Detective Eide was that *both defendants had guns.* Accordingly, defendant's argument must fail.

## XI

### *Cruel and Unusual Punishment*

Defendant Harris also raises two joint issues on appeal based on *People* v. *Dillon* (1983) 34 Cal.3d 441, 478 [194 Cal.Rptr. 390, 668 P.2d 697], and *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862], in his challenge to the 26-years-to-life sentence which he received for first degree murder while being armed with a firearm. Specifically, defendant Harris argues that the sentence was both cruel and unusual punishment and disproportionate.

Under *Dillon,* we examine the sentence in three areas: the nature of the offense, the nature of the offender, and the sentences given to other principals. (*People* v. *Dillon, supra,* at pp. 478-483; *People* v. *Leigh* (1985) 168 Cal.App.3d 217, 222-223 [214 Cal.Rptr. 61].) This offense was particularly brutal and heartless. The two defendants suddenly ganged up on "Deaf John" and in quick order took his money, beat him, and shot him twice.

Defendant Harris' particular circumstances were examined by the trial court at the time of sentencing, the court finding that he had extensive contacts with the law in terms of criminal violations as a juvenile and some minor contacts as an adult. Further, the court had already sentenced codefendant Thomas to 27 years to life just before sentencing defendant Harris.

Taking all three factors into consideration, we cannot conclude that a term of 26 years to life, for one who so clearly declared his intention to commit a robbery while armed and so brutally attacked his handicapped victim, is cruel or unusual punishment. We further note that defendant Harris may be released at an earlier date if the Board of Prison Terms finds sufficient circumstances in mitigation. We therefore hold that, under circumstances similar to those in *People* v. *Laboa* (1984) 158 Cal.App.3d 115, 120-122 [204 Cal.Rptr. 181], the punishment imposed upon defendant Harris for the crime of first degree murder is not cruel or unusual and is not disproportionate to the sentence received by defendant Thomas. Their joint cruelty merits a maximum sentence.

### Disposition

As to both defendants the judgments of conviction are affirmed and as to defendant Thomas the petition for writ of habeas corpus is denied.

Lillie, P. J., and Thompson, J., concurred.

Appellants' petitions for review by the Supreme Court were denied February 26, 1986.