[Crim. No. 38497. Second Dist., Div. Five. July 8, 1983.]

THE PEOPLE, Plaintiff and Respondent, v.
JUAN ALBERT CONTRERAS, Defendant and Appellant.

COUNSEL

Martin Jerry Blechman, Janyce Keiko Imata Blair and Juan Albert Contreras, in pro. per., for Defendant and Appellant.

John K. Van de Kamp, Attorney General, William R. Pounders and Pamela M. Nelson, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**FEINERMAN, P. J.**—In this case we deal with gang violence, motivated by gang members' desires for illegal gain, precipitating criminal offenses and gang-inflicted injuries to an innocent victim. Given this backdrop and given defendant's alibi defense and his denial of both gang membership and presence at the scene of the crimes, we find no merit in defendant's attempt to fashion a shield from criminal responsibility out of two appellate decisions rendered subsequent to his trial which condemn the *collateral* use of gang membership to stigmatize a defendant or witness in situations where gang membership is not relevant to identity or motive. As we shall point out in the body of this opinion, the cases relied upon by defendant are readily distinguishable from the case at bench.

After a jury trial, defendant Juan Albert Contreras was found guilty of robbery (Pen. Code, § 211), assault with intent to commit robbery (Pen. Code, § 221), attempted robbery (Pen. Code, §§ 664/211), and assault by means of force likely to produce great bodily injury (Pen. Code, § 245, subd. (a)(1)). Probation was denied and defendant was sentenced to prison for an upper term of five years on the robbery count, middle terms of twenty-four months on the assault with intent to commit robbery and attempted robbery counts, each of those terms to run concurrently with the robbery count, and a middle term of three years on the assault by means of force likely to produce great bodily injury count. The sentence on this count was stayed to avoid the multiple punishment proscriptions of Penal Code section 654. The sentence on the robbery count was enhanced by a finding of infliction of great bodily injury (Pen. Code, § 12022.7), and a three-year consecutive term was imposed which was ordered to run consecutively to the term imposed for the robbery. Defendant's total prison sentence amounted to eight years.

STATEMENT OF FACTS

On November 1, 1979, at approximately 11 p.m., Larry Jacques (Jacques), Carlos Luna (Luna), Magdy Salib (Salib) and Alfred Blechman

(Blechman) completed their shifts as security guards at the Bank of America offices located at Temple and Beaudry Streets in Los Angeles. Salib, Luna and Blechman walked to the bus stop at the corner, and Jacques drove by the bus stop to ask Luna and Blechman if they wanted a ride home. When Jacques stopped his car at the bus stop, a group of seven or eight young Latin males came running up to the bus stop. They were soon joined by a second wave of 18 to 25 individuals. The entire group started to harass the four off-duty security guards and demanded money. Jacques left his vehicle because he believed that someone was stabbing the tires of his automobile. He testified that defendant grabbed his shoulder when he left his car, but he was able to break away from defendant and get back into his car. Jacques stated it was a "traumatic experience" and he was fearful that he and Luna would be killed. Blechman also managed to get into Jacques' vehicle, and the two of them drove to the bank and contacted the police.

Luna was unable to get into Jacques' automobile, but he was able to escape from the group by running to the bank. He had previously surrendered a bag he was carrying containing some books, a tie, and keys to the group. He told them he had no money and members of the group demanded that he give them the bag. When various individuals started threatening him, Luna became frightened and started running. Almost the entire group chased Luna back to the bank. He stated that the defendant was one of the attackers and indicated that he was certain of his identification of defendant.

Salib was unable to escape from the group. He testified that the defendant had demanded money from him and struck him in the nose and broke his nose and teeth. One of the members of the group stabbed him with a knife in the underarm area and the group tried to throw him under a moving car. Salib stated that both his wallet and watch were missing after he was attacked and beaten. Jacques and Blechman found Salib lying in a pool of blood in a semi-conscious state near a flagpole in front of the bank.

On November 8, 1979, Jacques and Salib independently identified defendant as one of their assailants at a photographic showup held at police headquarters in Los Angeles. Other suspects were also identified as participants in the gang action. Jacques and Salib made their identifications from approximately 50 to 60 photographs of members of the Diamond Gang that were shown to them. They were in different rooms when they identified the defendant and did not look at the photographs together.

On November 7, 1979, Luna and Blechman were taken by the police on a tour of the neighborhood in which the crimes had been committed. While they were seated in a police vehicle, they passed the defendant's home. They saw the defendant in front of his house and both Luna and Blechman

immediately recognized the defendant. Blechman stated that the defendant was someone he had seen on the porch of a nearby house about 15 or 20 minutes after the gang attack, but he did not place the defendant at the scene of the crimes. Luna stated, "That's one of the guys" and indicated to the two police officers who were present that the defendant was one of the individuals that participated in the robbery. Luna also testified that he had identified the defendant at a photo showup held on November 7, 1979, prior to his tour of the neighborhood in the police vehicle. He described the defendant to the police as a "big guy, fat" and indicated that he had observed him for "no more than three minutes" on November 1, 1979.

Salvador Suarez was arrested on November 25, 1979, for participating in the robbery that occurred on November 1, 1979. After his arrest, he was given his *Miranda* rights and had a conversation with police officers McCann and Derenia and signed a written statement. At the time of defendant's trial, Suarez, who was sixteen and one-half, denied signing the written statement, denied all of the allegations contained in the written statement and denied making various oral statements to the police. However, he admitted that he was a member of the Diamond Gang.

Police Officer James McCann was assigned to Operations Central Bureau CRASH (Community Resources Against Street Hoodlums), a street gang suppression unit. He testified that he was acquainted with many of the members of the Diamond Gang and had come in contact with the defendant on numerous occasions. He stated that the defendant's nickname was Fat Johnny and indicated that it referred to the fact that defendant was corpulent. Pursuant to Evidence Code section 1235, Officer McCann was then asked about various statements made by the witness Suarez when he was interviewed by the police after being given his *Miranda* rights, which statements were inconsistent with the statements made by Suarez during defendant's trial. McCann testified that Suarez had told them "that it was Fat Johnny's idea to attack and rob the guards, that they [the gang members] needed more money for beer and dope." Suarez told them that the defendant said, "Those guys work at the bank; they must have money. Let's get them."

Defendant testified on direct examination that he had never been a member of the Diamond Gang and that he was not known as Fat Johnny. He further stated that he was at his sister's house having dinner at the time of the commission of the charged offenses. In rebuttal, Officer Derenia declared that he had had numerous contacts with defendant since 1975 and that the defendant had told him that he was a member of the Diamond Gang and that his moniker was Fat Johnny.

Defendant contends (1) the receipt into evidence of testimony regarding defendant's asserted gang membership constitutes an abuse of discretion;

(2) the unrelenting focus and concentration of efforts at every phase of the case on the gang aspect created a situation so unfair and suggestive as to constitute a denial of due process; and (3) the pretrial photographs and in-person identification processes used in the case were so suggestive and conducive to irreparable mistaken identification as to constitute a denial of due process.

## DISCUSSION

### I

At the outset we note that defendant's trial counsel did not object to any references made to defendant's purported gang membership at voir dire or at the time opening statements were made. Defendant's initial objection to this line of testimony occurred when witness Suarez was asked how long he had been a member of the Diamond Gang. Defendant objected on the ground of relevancy. The prosecuting attorney then made an offer of proof that the evidence of defendant's membership in the Diamond Gang was relevant to both his identity as one of the participants in the group attack and to his motive for participation in the assaults, robbery, and attempted robbery. The record indicates that the trial judge carefully exercised his responsibilities under Evidence Code section 352[1] and weighed the prejudicial aspects of this line of testimony against its probative value. The court concluded, and we believe properly so, that on the facts in this case the evidence offered was relevant to the issues presented and that the probative value of the evidence outweighed its prejudicial aspects. The court also admonished the jury immediately that evidence of gang membership was being admitted for limited purposes and could not be considered as evidence of bad character or propensity to commit crime. At the conclusion of the trial, the jury was instructed pursuant to CALJIC No. 2.50, as modified, on the limited purpose for which evidence of gang membership was admissible.[2]

---

[1]Evidence Code section 352 provides: The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, or confusing the issues, or of misleading the jury."

[2]CALJIC No. 2.50, as modified, was given to the jury as follows: "Evidence has been introduced that the defendant is a member of a particular gang. [¶] Such evidence, if believed, was not received and may not be considered by you to prove that he is a person of bad character or that he has a disposition to commit crimes. [¶] Such evidence was received and may be considered by you only for the limited purpose of determining if it tends to show: [¶] The identity and motive of the person who committed the crimes, if any, of which the defendant is accused. [¶] The existence or nonexistence of a bias or interest of any witness. [¶] For the limited purpose for which you may consider such evidence, you must weigh it in the same manner as you do all other evidence in the case. [¶] You are not permitted to consider such evidence for any other purpose."

Defendant's reliance upon *People* v. *Perez* (1981) 114 Cal.App.3d 470 [170 Cal.Rptr. 619] and *People* v. *Cardenas* (1982) 31 Cal.3d 897 [184 Cal.Rptr. 165, 647 P.2d 569] is misplaced. Neither case involved *group* action by gang members where the evidence of a defendant's gang membership was relevant to both his identity as one of the participants in the group action and to his motive for participation in a conspiratorial scheme.

Here, four victims were attacked by a group estimated to range in size from twenty to thirty-five in number. The evidence established that the group perpetrating the attack was the Diamond Gang. The evidence also established that someone matching defendant's physical description and having the nickname of Fat Johnny had participated in the group action. Defendant asserted an alibi defense and testified on direct examination that he was not a member of the Diamond Gang and never had used the nickname of Fat Johnny. In rebuttal, it was proper for Officer Derenia to testify that defendant was a member of the Diamond Gang and that his moniker was Fat Johnny. Evidence Code section 210 defines "relevant evidence" as "evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." Defendant's membership in the Diamond Gang was relevant to his identity as a participant in the group action and relevant to his credibility as a witness. In addition, Officer McCann's testimony regarding the prior inconsistent statements of the minor witness, Suarez, was relevant to the credibility of Suarez as a hearsay declarant.

Defendant's membership in the Diamond Gang was also relevant to his motive for participation in the charged offenses. The evidence indicated that the defendant had told other gang members at a gang meeting that they could obtain money needed by gang members for beer and dope by attacking the security guards. In *People* v. *Dominguez* (1981) 121 Cal.App.3d 481 [175 Cal.Rptr. 445], the court held that it was not error for the trial judge to admit evidence on the criminal purpose of the Nuestra Familia to prove a motive for a killing. Dominguez had claimed the trial judge abused his discretion under Evidence Code section 352 and that motive could have been established without reference to the gang's criminal endeavors. In response, the *Dominguez* court stated at pages 498-499, "Not so. In our opinion, this argument fails to demonstrate how motive could have been proved without showing that the Nuestra Familia engaged in criminal and violent acts and that members were obligated to commit such acts under penalty of their own lives. Since this evidence on motive logically and naturally aided the People in rebutting the presumption of innocence and showing a reason for Dominguez' criminal behavior, it cannot be said the trial judge erred in concluding that its probative value exceeded its prejudicial effect."

In *People* v. *Beyea* (1974) 38 Cal.App.3d 176 [113 Cal.Rptr. 254], the trial judge denied defendants' motion to exclude evidence of their membership in Hell's Angels, holding that the membership would be admissible to prove the defendants' identity and motive. The appellate court approved, stating, "As proof of the defendants' membership in the Hell's Angels was relevant to proof of motive and was material and necessary, we cannot say that the trial court erred in concluding that the evidence's probative value outweighed its prejudicial effect." (*Id.,* at p. 195.)

In *People* v. *Perez, supra,* 114 Cal.App.3d 470, a case that did not involve group action, we held that the record did not show that the trial judge adequately discharged his duty to weigh evidence of defendant's membership in a gang for prejudice against its probative value. However, we recognized ". . . that evidence of gang membership is not per se inadmissible. In order to be admissible it must meet the test of relevancy." (*Id.,* at p. 477.)

In *People* v. *Cardenas, supra,* 31 Cal.3d 897, the defendant was accused of attempted murder, attempted robbery, and assault with a deadly weapon or by force likely to produce great bodily injury. There were three victims and one perpetrator of the crimes, and the issue at trial was whether defendant was the perpetrator of the crimes. A plurality of three justices of the Supreme Court held that the trial court abused its discretion by allowing the prosecution to introduce evidence that Cardenas and his witnesses were affiliated with a youth gang. The court stated that the probative value of the gang membership evidence was minimal at best and cumulative in nature. The evidence was offered by the prosecution to establish possible bias of the defense witnesses in favor of the defendant. The prosecution desired to prove that the witnesses and defendant "lived in the same neighborhood" and "had the same circle of friends." The court pointed out that these facts had already been amply established by other testimony before the prosecutor began his inquiries into the witnesses' gang affiliations. The defense witnesses had testified that they were friends of the defendant and lived in the same neighborhood. Thus, "[t]he fact that appellant and the witnesses were also members of the Flores gang was cumulative and added little to further the prosecution's objective of showing that the witnesses were biased because of their close association with appellant. [Citation.]" (*People* v. *Cardenas, supra,* 31 Cal.3d 897, 904.)

As we have indicated previously, *People* v. *Cardenas, supra,* is distinguishable from the case at bench. Here, the evidence disclosed that a gang as a group, not an individual gang member, had assaulted, robbed, and attempted to rob the four victims. The evidence in this case revealed a conspiratorial scheme to perpetrate the attack on the four victims to obtain

money for the gang's use in acquiring beer and dope. We cannot say that the trial court abused its discretion under Evidence Code section 352 when it determined, after balancing the probative value vis-à-vis the prejudicial impact of the proffered evidence, that evidence of defendant's membership in the Diamond Gang was relevant to both identity and motive and that the probative value of the evidence outweighed the prejudicial effect. The jury was also carefully instructed regarding the limited purpose for which this evidence was admitted.

Even were we to assume, arguendo, that the court erred in admitting evidence of defendant's gang membership, it is not reasonably probable that he would have obtained a more favorable result.( *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) There was substantial evidence pointing to defendant's guilt. Salib positively identified defendant as the individual who hit him in the nose and broke his nose and teeth. Jacques identified defendant as the person who grabbed his shoulder when he got out of his car at the bus stop. Luna stated that he was positive that defendant was one of the persons he saw in the group that harassed him. Blechman saw defendant in the vicinity of Temple and Beaudry streets shortly after the crimes had been committed. There was no prejudice. (*People* v. *Parrison* (1982) 137 Cal.App.3d 529, 540 [187 Cal.Rptr. 123].)

## II

Defendant contends that the photo showup procedures utilized by the police were impermissibly suggestive because all the photographs used in the photo showups were photographs of members of the Diamond Gang and also because there were an insufficient number of photographs of individuals matching defendant's physical build. Defendant also contends that Luna's and Blechman's drive-by identifications of defendant, while he was in front of his house, did not comport with due process and were impermissibly suggestive.

"A conviction based on eyewitness identification at trial after a pretrial display of photographs, including photographs of the defendant, 'will be set aside . . . only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.'" (*People* v. *Hunt* (1977) 19 Cal.3d 888, 894 [140 Cal.Rptr. 651, 568 P.2d 376] citing *Simmons* v. *United States* (1968) 390 U.S. 377, 384 [19 L.Ed.2d 1247, 1253, 88 S.Ct. 967].) "When the fairness of a confrontation is challenged, the burden is on the defendant to establish that the confrontation resulted in such unfairness that it infringed his right to due process." (*People* v. *Hunt, supra,* 19 Cal.3d 888, 893.)

In this case we find no evidence of unfairness or "priming" in either the photographic identification procedures or in the drive-by identifications of defendant when he was on his front porch.

The police utilized the photographs of the Diamond Gang members because they believed that the suspects they had arrested were members of the Diamond Gang.[3] Between 50 to 60 photographs were shown to the victims, and the photographs were arranged in alphabetical order. Prior to the photographic showup, the victims were given an admonition to look at the photographs in an unbiased manner and were advised that the showup was to eliminate the innocent as well as to determine who the guilty were. Jacques and Salib examined the photographs separately in different rooms and each made a positive identification of the defendant without talking to the other and without any prompting or contact with police officers. When the trial judge examined the stack of photographs that were shown to the victims, the court stated that it saw at least two photographs of individuals, who, although not quite of defendant's magnitude, could be certainly described as heavy-set, stocky, male Latins.

When Blechman and Luna rode in the police car on November 7, 1979, they were trying to identify the houses to which the gang members had run after the November 1, 1979, events. When Blechman and Luna observed the defendant in front of his house, it was a happenstance contact between the victims and the defendant. There is no evidence that it was planned in advance by anyone. Without any prompting by the police or by each other, both Luna and Blechman pointed out the defendant and stated, "That is one of the suspects."

The trial court overruled the defendant's objections to the identification procedures after holding a pretrial Evidence Code section 402 hearing. The court's findings are supported by substantial evidence. Nothing that occurred during the trial changed the situation. Defendant has not sustained his burden of proving a denial of due process. (*People* v. *Hawkins* (1970) 7 Cal.App.3d 117, 122 [86 Cal.Rptr. 428].)

---

[3] In light of the fact that it is the police department's responsibility to apprehend the perpetrators of criminal acts, it would be absurd to impose upon law enforcement officers the obligation to obtain photographs of members of other gangs or photographs from the community at large when the officers were confident in this case that the criminal acts were committed by the members of the Diamond Gang. Adherence to standards of fairness does not require the performance of useless acts.

The judgment is affirmed.

Ashby, J., and Hastings, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied October 20, 1983.