[No. A041421. First Dist., Div. Three. May 10, 1989.]

THE PEOPLE, Plaintiff and Respondent, v.
WILLIE D. JOHNSON, Defendant and Appellant.

[Opinion certified for partial publication.*]

* Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication
with the exception of part IV.

COUNSEL

Robert D. Reichman and Jo Anne Keller, under appointments by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, John H. Sugiyama, Assistant Attorney General, Ronald S. Matthias and Mary A. Roth, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

MERRILL, J.—Appellant Willie D. Johnson was charged by information with committing the following offenses on July 29, 1987: count I, second degree robbery of Willie Berry (Pen. Code,[1] § 212.5, subd. (b)); count II, assault with a firearm against Berry (§ 245, subd. (a)(2)); count III, unlawful taking of a vehicle from Berry (Veh. Code, § 10851); count IV, possession of a firearm by an ex-felon (§ 12021.1). The information also charged that Johnson committed the following offenses on July 27, 1987: count V, second degree robbery of Muawattia Mabrey (§ 212.5, subd. (b)); count VI, assault with a firearm upon Mabrey (§ 245, subd. (a)(2)); count VII,

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

unlawful taking of a vehicle from Mabrey (Veh. Code, § 10851); and count VIII, possession of a concealable firearm by an ex-felon (§ 12021.1). In connection with counts I, II, and III, it was alleged that Johnson personally used a firearm (§ 12022.5) and a deadly weapon (§ 1192.7, subd. (c)(23)). As to counts V, VI, and VII, it was alleged that Johnson personally used a firearm in violation of both section 12022.5 and section 1192.7, subdivision (c)(8) and that he personally used a deadly weapon (§ 1192.7, subd. (c)(23)). The allegation that Johnson personally inflicted great bodily injury (§ 12022.7) was also included in counts V and VI.

As to Johnson's previous convictions for manslaughter and murder, it was alleged that he had been convicted of prior serious felonies (§§ 667, 1192.7), prior violent felonies (§ 667.5, subd. (a)), and that he served prison terms for these felonies (§ 667.5, subd. (b)).

The court ordered entry of Johnson's plea of not guilty as to the charges and denial of the enhancement allegations. Following the denial of two *Marsden* motions (*People* v. *Marsden* (1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44]), a section 995 motion to dismiss and a change of venue motion, the court denied Johnson's motion to exclude the identification testimony of victim Willie Berry. However, his motion for a bifurcated trial on the prior convictions was granted. Thereafter, Johnson waived his right to jury trial on the substantive charges and a court trial was conducted. As to the prior conviction enhancement allegations, Johnson received a jury trial.

The court found Johnson guilty as charged on all counts. The enhancement allegations before the court were found to be true except for the two great bodily injury allegations in counts V and VI.

Pursuant to the district attorney's motion, the four enhancement allegations under section 667.5, subdivisions (a) and (b), were stricken. The information was amended to change the date of his prior murder conviction to June 1, 1987. The jury found the two prior conviction allegations for murder and manslaughter, pursuant to sections 667 and 1192.7, to be true.

I

*Offenses of July 27, 1987*

On the evening of July 27, 1987, while 14-year-old Muawattia Mabrey was unloading laundry from his car to take into a laundromat in San Francisco's Hunters Point district, a man walked up to him and demanded his car keys and all his money. Mabrey replied, "I ain't giving you nothing." The man said, "What I say," but Mabrey did not reply. The man then

pulled a gun from his pants and shot Mabrey in the wrist from a distance of three feet. He took Mabrey's keys and his $10, got in the car and drove away.

Mabrey testified that he observed the robber's face for 20 seconds until his attention was diverted by the gun. It was dark, but the street lights were on, and Mabrey could see that the perpetrator had dark skin, short hair, a clean-shaven face except for some hair on his chin, and weighed about 175 pounds. He also observed that the man was wearing "Ponies," a shoe brand, a big blue coat and a knit hat.

At trial, Mabrey identified certain items of his own clothing that were left in the car. He also identified a jacket and hat as those worn by the robber.

One or two days after the robbery and shooting, a police inspector came to Mabrey's house and showed him a set of six photographs. The officer told him he should not conclude that the perpetrator's picture was in the photo spread. Mabrey testified that he did not know Johnson's picture would be in the lineup before he viewed it. As soon as the officer placed the fourth photograph on the table, Mabrey stated, "That's the person that shot me, that's him, he shot me. He was wearing a hat when he shot me." He had identified Johnson.

While in the hospital, the inspector told Mabrey that he was lucky to be alive. The evidence also showed that after the photographic identification, but before Mabrey came to court the first time, he saw a poster of Johnson in the Hall of Justice. He could not read the writing but someone told him that Johnson was wanted for escaping from jail. In addition, a friend told Mabrey that Johnson had robbed other people. Mabrey stated that as he looked at Johnson in court he looked just like the man in the poster.

*Offenses of July 29, 1987*

On the evening of July 29, 1987, Willie Berry drove back to his home in the Hunters Point district after doing some grocery shopping. He locked his car door and walked toward his front gate. Someone came from behind him and demanded his car keys and wallet. At first Berry did not understand that the robber was talking to him so he kept walking. The man repeated the command. Berry turned around to find a revolver pointed at his face. The command was repeated a third time. At trial, he identified Johnson as the man who demanded his money and keys and the man who held a gun to his face.

The street light was directly over Berry's head so he could see Johnson's face clearly. Berry handed over his keys. Johnson went to the car and Berry

attempted to get to his front gate, approximately six feet away. Johnson returned and asked for Berry's wallet and which key opened the car door. He then took Berry's grocery bag and walked back to the car. Berry never gave him his wallet.

At about this time, Berry's son came to the gate and let him in. Berry could see that Johnson had managed to open the car door. From his living room window, he saw his car heading down Thomas Street. His wife called the police. Berry ran out of his house in time to see his car turn left on to Silver Avenue. He ran to the corner of Thomas and Silver and saw his car turn on to Bayshore Boulevard.

After approximately two minutes, Officer Mullins and his partner Officer Ghiselli picked Berry up at the corner of Thomas and Silver and drove in the direction he described. Within eight to ten minutes later, Berry spotted his car passing through the intersection of Bacon and San Bruno Streets. Less than five minutes later, Berry saw his car abandoned on Donner Street. The driver's door was left open and the motor was running.

Mullins testified that after they saw the car on San Bruno Avenue, they pursued it for approximately three minutes. The driver was the only person in Berry's car. After they observed the abandoned car, Mullins heard someone running and then hopping over a fence. He informed other officers that the suspect was going through backyards in the neighborhood. Mullins observed a revolver in Berry's car. He then drove Berry to another location about a block and one-half away.

Officer Robles received communications about the pursuit and responded to Carroll and Phelps Streets. From a distance of 20 feet, Robles next observed a Black man in dark clothing jump over a fence from a backyard. Robles pursued the suspect on foot until he ran up a flight of stairs and attempted to hide on a porch landing. With his weapon drawn, the officer ordered Johnson down and arrested him.

Berry testified that while waiting in Officer Mullins's patrol car he decided of his own initiative to walk over to another patrol car parked nearby. He peered into the car and saw a man sitting in the back seat with his hands behind his back. He testified that he assumed the person he saw was the suspect. The next time Berry saw Johnson was when he was brought, in handcuffs, into the Potrero Hill station by police officers. After he provided the police with a written statement identifying Johnson as the perpetrator, an officer told Berry that Johnson had killed two people and escaped from prison. The following day Berry saw a composite drawing of Johnson on a television news broadcast.

Berry stated that he had his best opportunity to observe Johnson at the time of the robbery. At trial Berry testified he clearly remembered the face of the person holding the revolver to his head and that this was Johnson. However, he also testified that his in-court identification of Johnson was based on his four prior observations of him: during the offense, seated in his car, seated in the patrol car and in the police station.

## II

■ Johnson contends the trial court erred by denying his motion to exclude Berry's testimony concerning both his out-of-court and in-court identification of him. The court found that nothing about the four instances in which Berry observed Johnson demonstrated impermissible suggestion and ruled the identification testimony was admissible. We hold there is substantial evidence to support the trial court's finding. (*People* v. *Sandoval* (1977) 70 Cal.App.3d 73, 84 [138 Cal.Rptr. 609, 99 A.L.R.3d 765].)

■ It is well established that convictions based on eyewitness identification at trial, after a pretrial identification, constitute a denial of due process only if the pretrial identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. (*Stovall* v. *Denno* (1967) 388 U.S. 293, 301-302 [18 L.Ed.2d 1199, 1206, 87 S.Ct. 1967]; see also *Neil* v. *Biggers* (1972) 409 U.S. 188, 198 [34 L.Ed.2d 401, 410-411, 93 S.Ct. 375]; *Simmons* v. *United States* (1968) 390 U.S. 377, 384 [19 L.Ed.2d 1247, 1253, 88 S.Ct. 967]; *People* v. *Bisogni* (1971) 4 Cal.3d 582, 587 [94 Cal.Rptr. 164, 483 P.2d 780].) A court must review the "totality of the circumstances" in order to determine whether due process has been violated. (*Stovall* v. *Denno, supra,* 388 U.S. at p. 302 [18 L.Ed.2d at p. 1206]; *People* v. *Blair* (1979) 25 Cal.3d 640, 659 [159 Cal.Rptr. 818, 602 P.2d 738].) Suggestive confrontations violate due process because they increase the likelihood of irreparable misidentification. (*Neil* v. *Biggers, supra,* 409 U.S. at p. 198 [34 L.Ed.2d at p. 410].) Where there has been a chance police station identification, the issue is not whether a confrontation occurred but whether the circumstances of the confrontation were unduly suggestive. (*People* v. *Hunt* (1977) 19 Cal.3d 888, 893 [140 Cal.Rptr. 651, 568 P.2d 376].)

■ Where the challenge is to the fairness of the pretrial identification the burden is upon the defendant to show that it was suggestive or unfair. (*People* v. *Cooks* (1983) 141 Cal.App.3d 224, 305 [190 Cal.Rptr. 211], cert. den. *sub nom. Green* v. *California* (1984) 464 U.S. 1046 [79 L.Ed.2d 180, 104 S.Ct. 718], citing *People* v. *Hunt, supra,* 19 Cal.3d at p. 893.) If the defendant sustains his burden of showing the pretrial identification was suggestive, the in-court identification need not necessarily be excluded if the

People can demonstrate that the in-court identification was otherwise reliable. (*Cooks, supra,* at pp. 305-306.)

■ A single person showup is not necessarily unfair and must be assessed in the light of the totality of the circumstances. (*Stovall* v. *Denno, supra,* 388 U.S. at p. 302.) One of the justifications for a showup is the need to exclude from consideration innocent persons so that the police may continue the search for the suspect while it is reasonably likely he is still in the area. (*Ibid.*)

■ In the first instance Berry's spontaneous viewing of Johnson in a patrol car did not constitute a pretrial identification. The evidence is uncontradicted that Berry first identified Johnson after his police station viewing. Moreover, under the circumstances of this case, a happenstance viewing of the defendant by the victim does not constitute a denial of due process. (*People* v. *Contreras* (1983) 144 Cal.App.3d 749, 759 [192 Cal.Rptr. 810, 39 A.L.R.4th 764].)

Immediately thereafter Berry observed Johnson when police officers brought him into the police station. He instantly identified him as the robber. He testified at trial that during the robbery he observed Johnson's face from a distance of an arm's length plus eight to ten inches. He was standing directly under a street light at the time. Only a short period of time had elapsed between Berry's observations of Johnson at the crime scene and at the police station. He stated he clearly remembered Johnson's face as that of the perpetrator. Additionally, his description of the perpetrator matched Johnson precisely. The likelihood of misidentification is extremely remote.

The procedure of Berry's pretrial station house identification was not impermissibly suggestive in this case. In contrast to the *Sandoval* case relied upon by Johnson, prior to his identification, the police officers did not indicate that they had apprehended the suspect or that they would be showing Berry the suspect. (*People* v. *Sandoval, supra,* 70 Cal.App.3d at pp. 80, 85.) Berry testified that he was simply waiting in the police station when Johnson was brought in through the doors.

Additionally, we find no merit in the contention that the officer's comments that Johnson was an escapee unduly prompted his identification. The pretrial identification of Johnson occurred one-half hour *prior* to this statement. Substantial evidence supports the trial court's findings.

### III

Johnson had been convicted of first degree murder with special circumstances in Contra Costa County on June 1, 1987, but as a result of his escape, judgment was not pronounced until August 5, 1987. The informa-

tion in the instant case, filed on December 3, 1987, alleged prior serious felony convictions for murder and manslaughter, which the jury, on February 3, 1988, found to be true. On February 11, 1988, Johnson received a 17-year state prison sentence which included a 5-year enhancement for the prior conviction of murder. ■ Johnson contends that the section 667 prior serious felony enhancement allegation pertaining to this 1987 murder conviction should have been stricken in the instant case as the judgment date was subsequent to his commission of the offenses on July 27, 1987, and July 29, 1987. For this reason he asserts that he had not suffered a "conviction" for the purpose of a prior serious felony enhancement under section 667. Johnson maintains that the trial court's denial of his section 1118.1 motion for judgment of acquittal made on this basis was error. We disagree.

Subdivision (a) of section 667 provides in part that "any person convicted of a serious felony who previously *has been convicted* of a serious felony in this state . . . shall receive, in addition to the sentence imposed by the court for the present offense, a five-year enhancement for each such *prior conviction* on charges brought and tried separately." (Italics added.)

Johnson has not cited and we are not aware of a California case which has analyzed whether a defendant "has been convicted" within the meaning of section 667 if he has not also received the pronouncement of judgment. However, in other contexts our courts have ruled that the term "conviction" for purposes of sentencing refers solely to the ascertainment of guilt, i.e., the verdict, and does not include the judgment. (See *Callahan v. Department of Motor Vehicles* (1976) 61 Cal.App.3d 704, 707-708 [132 Cal.Rptr. 625] [determining whether defendant's conviction had occurred before a statutory reduction of penalty for prior convictions under Veh. Code, § 13352]); *People v. McCuiston* (1966) 246 Cal.App.2d 799, 808-809 [55 Cal.Rptr. 482] [interpreting the meaning of prior conviction under former Health & Saf. Code, § 11500]); *People v. Loomis* (1965) 231 Cal.App.2d 594, 596 [42 Cal.Rptr. 124] [determining that defendant had suffered a prior conviction in context of § 12021, ex-felon in possession of gun, although sentence suspended and placed on probation]; *People v. Hurley* (1957) 155 Cal.App.2d 350, 351-352 [317 P.2d 1003] [interpreting the meaning of prior conviction under former Health & Saf. Code, § 11500]); *People v. Clapp* (1944) 67 Cal.App.2d 197, 199-200 [153 P.2d 758] [interpreting the requirements for charging a prior conviction of a felony within the meaning of §§ 969, 969a]); *People v. Acosta* (1931) 115 Cal.App. 103, 107 [1 P.2d 43] [interpreting the meaning of a conviction under former § 1203]; see also *United States v. Locke* (D.Idaho 1976) 409 F.Supp. 600, 603 [interpreting when a conviction occurs under a federal recidivist firearm statute].)

The Court of Appeal in *People v. Clapp, supra,* 67 Cal.App.2d at page 200, found no error in the trial court's refusal to strike the allegation of

appellant's prior felony conviction under sections 969 and 969a, which set forth the form and procedure for amending allegations of prior felony convictions. The court stated: "Appellant contends that at the time of the filing of the information and at the time of the trial he had not been convicted because his judgment of conviction in the former case was on appeal. This contention has been disposed of repeatedly. [Citations.] The jury, or the court where a jury has been waived, convicts the accused. [Citation.] Conviction does not mean the judgment based upon the verdict, but it is the verdict itself. [Citation.] It is the ascertainment of guilt by the trial court. [Citation.]" (*Ibid.*)

Similarly, the court in *People* v. *Loomis, supra,* 231 Cal.App.2d at page 596, rejected the argument that appellant had suffered no conviction within the meaning of section 12021, the offense of ex-felon in possession of a gun, even though his sentence had been suspended and he had been placed on probation. The Court of Appeal noted: "Both federal and state courts have held that a plea or finding of guilty constitutes a conviction within the meaning of the statutes whose applicability depends upon prior offenses. [Citations.]" (*Ibid.*) We are in accord with these cases and hold that in the case at bench conviction means the verdict alone and not the judgment based upon the verdict.

### IV*

. . . . . . . . . . . . . . . . . . . .

### V

The judgment is affirmed.

White, P. J., and Strankman, J., concurred.

Appellant's petition for review by the Supreme Court was denied August 10, 1989.

---

* See footnote, *ante,* page 316.