Filed 9/13/13  P. v. Bassett CA1/5
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| **THE PEOPLE,**<br><br>　　　　**Plaintiff and Respondent,**<br><br>**v.**<br><br>**RAYMONT D. BASSETT,**<br><br>　　　　**Defendant and Appellant.** | **A134920**<br><br>**(San Francisco County<br>Super. Ct. No. 21585202)** |

　　　　The San Francisco District Attorney charged Raymond D. Bassett and an accomplice with second degree robbery.  (Pen. Code, § 211.)  Bassett was alleged to have robbed his victim of an iPhone.  Shortly after the crime occurred, the victim identified Bassett as one of the perpetrators during a "cold show."[1]  A jury later found Bassett guilty of the charge, and after a bifurcated trial, the court found true allegations of a prior serious felony conviction and a prior strike conviction within the meaning of Penal Code sections 667, subdivisions (a)(1), (d), and (e), 1170.12, subdivisions (b) and (c).  Bassett was sentenced to eight years in prison and filed a timely notice of appeal.

　　　　In this court, Bassett raises a single issue.  He contends the victim's field identification of him was the result of an identification procedure so impermissibly suggestive that it gave rise to a very substantial likelihood of irreparable

---

[1] The term "cold show" in this context refers to a field identification procedure in which the victim of crime is taken to view a person detained by police to determine whether or not the person committed the crime.

1

misidentification. He argues the trial court committed reversible error by admitting the identification. We find this argument unpersuasive and will therefore affirm.

FACTUAL AND PROCEDURAL BACKGROUND

Bassett moved in limine for a ruling on the admissibility of the victim's field identification. He contended there was "evidence that the complaining witness was fed a description of Mr. Bassett prior to the cold show," which "created an identification procedure that was 'so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.' *Simmons v. United States* (1968) 390 U.S. 377, 384[.]" The trial court held a hearing pursuant to Evidence Code section 402 at which the victim and several police officers testified.

The victim, sixteen-year-old D.M., testified he was "mugged at a bus stop" on May 25, 2011, at approximately 4:45 p.m. D.M. explained he had been mugged by three men. After he was mugged, he walked to a nearby corner store and called 911. He was rattled and very nervous when he spoke to the 911 operator and did not think he could give a description.[2] He told the operator there had been a man to his right wearing a black hoodie and a white T-shirt. D.M. said there was a second man who was "a taller, bigger guy" with short dreadlocks standing in front of him, and a third man on his left who actually took D.M.'s iPhone. He recalled the least about the man on his left, but remembered he was wearing an item of red clothing.

The man with the dreadlocks stood directly in front of D.M. during the robbery. He was a black male, and his dreadlocks were short and stopped at the man's ears. D.M. did not remember if the man had facial hair. D.M. recalled telling the 911 operator that the man with dreadlocks wore a hoodie and a beanie.

Officer Kevin Byrne responded to a dispatch concerning a robbery at the corner of Van Ness and Clay. He and his partner Officer Coleman made contact with D.M. and asked him questions about the incident. After a brief interview with D.M., Officers Byrne and Coleman searched the surrounding area looking for suspects. Officer Steven

---

[2] D.M. testified that when he was subsequently interviewed by the police, the descriptions of the men "came back" to him.

2

Needham called on the radio and asked how long ago the incident had occurred. Byrne spoke to D.M. again, who told him the incident had happened five to ten minutes earlier. Officer Needham then asked whether one of the men was wearing a white T-shirt under a black T-shirt. D.M. said the man wore a white T-shirt under a black hoodie.

Officer Needham testified he stopped at an intersection on the afternoon of May 25, 2011, when he saw Bassett walking with two other men. Needham watched the men for five to ten seconds, and then sent a radio transmission to Officer Byrne, one the officers who was with D.M. Needham had Byrne ask D.M. if one of the men was heavy-set with dreadlocks, wearing a black T-shirt with a long white T-shirt underneath it. After a pause, Byrne radioed back and said the descriptions matched.

At some point, D.M. was asked to identify three individuals. The police took him to identify the people they had picked up. Before D.M. was taken from the corner store to identify any suspects, the police had him read and sign a San Francisco Police Department Cold Show Admonition and Report form. The form stated that he might or might not see the culprits, that he should not assume that the people he would see were the ones who committed the crime, and that he did not have to identify anyone. A police officer read the form to D.M. aloud. He was asked whether he understood what it meant, and he said he did.

The officers then drove D.M. to view three people. D.M. did not remember hearing radio conversations between officers while they drove. He identified two of the people as the men who robbed him. He testified that his identification of the two people who robbed him was based on his own personal recollection of the incident.

After he made the identifications, D.M. was taken to the police station where he had a further conversation with the police officers. There, he was told the police had apprehended two of the three men who robbed him, and that a third man, whom D.M. had been unable to identify, had left.

When the testimony at the hearing on the motion in limine concluded, the court heard argument from counsel. Defense counsel pointed out that D.M. could not describe the robbers when he spoke with 911. She contended that while D.M. was in the police

car, Officer Needham called on the radio with a "description that did not comport with the original description given by [D.M.]," in that it did not mention a white T-shirt. D.M. was asked whether one of the robbers wore a long white T-shirt and a black T-shirt, and he answered yes. D.M. then identified Bassett, who was wearing clothes that, counsel argued, he had heard described over a police radio. Defense counsel asserted that the cold show identification procedure was suggestive and should be excluded because D.M. was "fed" the description of the robber by the police before he was asked to identify him. She argued the procedure was suggestive because "[w]e have one individual with dreadlocks . . . who is being shown by a police officer after having been described by another police officer to this young, frightened child, who says he's never had anything . . . like this happen to him before." Counsel concluded by saying that allowing D.M. to make an in-court identification when he had no recollection of what the defendant looked like would "make[] a mockery of justice."

The prosecutor argued the defense had failed to show there was a substantial likelihood of misidentification because the police admonished D.M. before the field identification that he did not have to identify anyone, and that the people he was going to see might or might not be the perpetrators. The prosecutor disputed the argument that D.M. had gotten his description of Bassett from overhearing police radio communications, noting the victim had testified credibly that he did not remember hearing any such conversations between the officers while they drove around looking for suspects. Most importantly, D.M. "testified that his identification at that cold show was based on his own personal recollection of the robbery, not on anything that anybody told him before the ID."

In rebuttal, defense counsel expressed her belief that D.M. was being "absolutely truthful in all respects." The problem, in her view, was that D.M. did not recall hearing the radio transmission which planted the description in his mind and was thus unaware of its effects on him. In response to the trial court's comment that she was asking it to "base a ruling on a state of mind of a declarant he can't even remember," counsel countered that she was asking the court to rule based on the police officers' testimony that they had

4

relayed a description of Bassett to D.M. D.M. had then "internalized these [questions] into the identification and does not remember them coming from outside."

The trial court denied the motion.

DISCUSSION

Basset contends the suggestive identification violated his rights under the due process clause of the Fourteenth Amendment. He argues the identification procedures were unduly suggestive and unnecessary and that D.M.'s identification of him at the cold show and during trial were not reliable.[3] After examining both the record and the applicable law, we conclude the identification procedure was not unduly suggestive.

I.     *Governing Law and Standard of Review*

"It is well established that convictions based on eyewitness identification at trial, after a pretrial identification, constitute a denial of due process only if the pretrial identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. [Citations .] A court must review the 'totality of the circumstances' in order to determine whether due process has been violated. [Citations.] . . . [¶] Where the challenge is to the fairness of the pretrial identification the burden is upon the defendant to show that it was suggestive or unfair. [Citations.] If the defendant sustains his burden of showing the pretrial identification was suggestive, the in-court identification need not necessarily be excluded if the People can demonstrate that the in-court identification was otherwise reliable. [Citation.]" (*People*

---

[3] Bassett also raises a number of arguments regarding the reliability of cross-racial identification and the allegedly negative correlation between an eyewitness's level of confidence in an identification and the accuracy of that identification. No evidence or argument on these issues was presented at the hearing on Bassett's motion in limine, and we therefore do not consider them. (See *People v. Torres* (2010) 188 Cal.App.4th 775, 780 [motion to suppress "must be reviewed on the record as it existed when the court decided the motion"].) Moreover, Bassett's opening brief does not cite to anything in the record showing that he made a timely and specific objection to the identification on these bases in the trial court. (*People v. Huggins* (2006) 38 Cal.4th 175, 240, fn. 18, 242-243 & fn. 19 [defendant forfeited objection that identification procedure violated Fifth, Eighth, and Fourteenth Amendments by raising only Sixth Amendment objection in trial court].)

5

*v. Johnson* (1989) 210 Cal.App.3d 316, 322-323 (*Johnson*).) The defendant must show the unfairness of the confrontation as a demonstrable reality, not simply speculation. (*In re Carlos M.* (1990) 220 Cal.App.3d 372, 386 (*Carlos M.*).)

To determine whether the admission of identification evidence violates a defendant's right to due process of law, we consider: "(1) whether the identification procedure was unduly suggestive and unnecessary, and, if so, (2) whether the identification itself was nevertheless reliable under the totality of the circumstances, taking into account such factors as the opportunity of the witness to view the suspect at the time of the offense, the witness's degree of attention at the time of the offense, the accuracy of his or her prior description of the suspect, the level of certainty demonstrated at the time of the identification, and the lapse of time between the offense and the identification." (*People v. Cunningham* (2001) 25 Cal.4th 926, 989.) Our review of the trial court's factual findings is deferential, particularly when those findings turn on credibility determinations. (*People v. Alexander* (2010) 49 Cal.4th 846, 902.) We determine de novo whether, under the facts found, the pretrial identification procedure was unduly suggestive. (*Ibid.*) "'Only if the challenged identification procedure is unnecessarily suggestive is it necessary to determine the reliability of the resulting identification.' [Citation.]" (*Ibid.*)

II.     *The Cold Show Identification Procedure Was Not Unnecessarily Suggestive.*

In this case, D.M. identified Bassett at a single-person showup. Such a procedure "is not necessarily unfair and must be assessed in the light of the totality of the circumstances. [Citation.] One of the justifications for a showup is the need to exclude from consideration innocent persons so that the police may continue the search for the suspect while it is reasonably likely he is still in the area. [Citation.]" (*Johnson, supra,* 210 Cal.App.3d at p. 323; see also *People v. Ochoa* (1998) 19 Cal.4th 353, 413 [single person showup not inherently unfair].) "An innocent person who has been apprehended should not have to wait for the assembly of a lineup and the summoning of counsel while the real culprit puts more time, and presumably distance, between himself and the focal point of the offense." (*People v. Cowger* (1988) 202 Cal.App.3d 1066, 1072.)

6

Moreover, "the law favors field identification measures when in close proximity in time and place to the scene of the crime, with the rationale for the rule being stated: 'The potential unfairness in such suggestiveness, however, is offset by the likelihood that a prompt identification within a short time after the commission of the crime will be more accurate than a belated identification days or weeks later.'" (*In re Richard W.* (1979) 91 Cal.App.3d 960, 970.)

Bassett has failed to meet his burden of demonstrating that the circumstances of the cold show were unduly suggestive. (*Carlos M., supra,* 220 Cal.App.3d at p. 386.) His principal argument is that D.M.'s young age made him particularly susceptible to altering his descriptions of the robbers based on "the suggestions directed at him by the officers who interviewed him and the other officers whose comments were audible over the radios." First, we note there was no evidence presented below that a 16-year-old is particularly susceptible to the kind of suggestion Bassett claims occurred. Since we must review the trial court's ruling based on the record before it at the time of its ruling, and no such evidence was before the trial court, we have no basis on which to evaluate this argument. (*People v. Torres, supra,* 188 Cal.App.4th at p. 780.)

Second, Bassett's argument is based in large part on the notion that D.M. heard the police radio conversations that allegedly suggested a particular description to him. As discussed above, however, D.M. was asked whether he had heard those transmissions, and he testified specifically he did not recall hearing them. The trial court appears to have believed this testimony, and it was its function to resolve any conflicts in the facts and assess D.M.'s credibility. (*In re Richard W., supra,* 91 Cal.App.3d at p. 971.) Thus, Bassett's contention "is both purely speculative and contrary to the record," and such speculation will not support a claim that the identification procedure was unduly suggestive. (*Carlos M., supra,* 220 Cal.App.3d at p. 386.)

Bassett relies on the fact that D.M. initially told the 911 dispatcher that he couldn't identify any of the individuals he saw at the bus stop. Although D.M. did make this statement, it is also true that he told the 911 operator that the man he later identified as appellant had short dreadlocks. Even though he was shaken in the immediate aftermath

of the robbery, D.M. was still able to remember Bassett's distinctive hairstyle. Moreover, D.M. testified that at the time he made the 911 call he was "really, really nervous" but that "as time passed, the descriptions came back to [him]" when he was questioned by the police. While Bassett focuses heavily on D.M.'s initial failure to mention that the person who stood in front of him was wearing a white T-shirt, the omission of this descriptor does not alone demonstrate that the identification procedure was unduly suggestive. (Cf. *Carlos M., supra,* 220 Cal.App.3d at p. 387 [victim's description of attacker was accurate despite being wrong as to type of pants he was wearing].)

It is also significant that D.M. was admonished that merely because the individuals he was shown were detained by the police, that did not mean they had committed a crime. D.M. understood he did not have to make any identification at all. And in fact, although D.M. recalled that one of the robbers wore a red item of clothing, he did not identify the third suspect, who was also detained, handcuffed, and wearing a red shirt. These facts are similar to those of *Carlos M., supra,* 220 Cal.App.3d 372, where during a field identification, the victim of the crime was shown two suspects together. (*Id.* at p. 386.) She had earlier positively identified one of two suspects but did not identify the other. (*Ibid.*) The court held this showed the victim's ability to distinguish between people she recognized and those she did not. (*Ibid.*) Likewise, D.M.'s failure to identify the third suspect indicates he was not influenced by the circumstances of the cold show procedure. (See *ibid.* [fact that victim was shown a recognized attacker with a companion did not cause her to assume companion was also involved in crime].)

Bassett also complains that after the cold show identifications took place, D.M. was taken to the police station and interviewed again, at which time he "was told that the officers had arrested two of the men who robbed him." Of course, this could not have influenced D.M.'s *field* identifications, since they occurred before any conversation at the police station. (See *Johnson, supra,* 210 Cal.App.3d at p. 323 [officer's statement that defendant was an escapee could not have prompted pretrial identification because identification occurred a half hour prior to statement].) Furthermore, Bassett's contention that D.M.'s in-court identification was tainted because the officers had confirmed the

correctness of the field identification is unsupported by any citation to the record of the Evidence Code section 402 hearing. Bassett points to nothing in the record suggesting that the police specifically told D.M. that *Bassett* was one of the men they had arrested. D.M. himself testified only that the police officers told him "they had gotten two of the guys[.]"

In sum, Bassett has not shown that "the pretrial identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." (*Johnson, supra,* 210 Cal.App.3d at p. 322.) Substantial evidence supports the trial court's denial of Bassett's motion in limine.[4] (*Id.* at p. 323.)

DISPOSITION

The judgment is affirmed.

_____

Jones, P.J.

We concur:

_____

Needham, J.

_____

Bruiniers, J.

---

[4] Because "'we find that [the] challenged procedure is not impermissibly suggestive, our inquiry into the due process claim ends.' [Citation.]" (*People v. Ochoa, supra,* 19 Cal.4th at p. 412.) We therefore do not reach Bassett's claim that D.M.'s identification was not reliable. As stated earlier, Bassett forfeited a number of the reliability arguments he makes here by failing to raise them below. (See *ante,* p. 5, fn. 3.)