Filed 3/10/15  In re M.D. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re M.D., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE,  Plaintiff and Respondent,  v.  M.D.,  Defendant and Appellant. | E059784  (Super.Ct.No. J249819)  O P I N I O N |

APPEAL from the Superior Court of San Bernardino County.  Barbara A. Buchholz, Judge.  Affirmed.

Sarita Ordonez, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, and Eric A. Swenson, Lynne G. McGinnis, Kristine A. Gutierrez, and Christopher P. Beesley, Deputy Attorneys General, for Plaintiff and Respondent.

## I.  INTRODUCTION

Defendant and appellant M.D. appeals the juvenile court's October 3, 2013, dispositional order committing him to the Gateway residential facility in San Bernardino for 18 months, based on the court's finding he robbed a cashier at a convenience store. (Pen. Code, § 211.)  M.D. claims the court erroneously admitted his involuntary confession to the robbery, along with unduly suggestive and unreliable identification evidence, and absent this evidence there was insufficient evidence to support the true finding on the robbery charge.  M.D. also claims the court abused its discretion in placing him in the Gateway program rather than a less restrictive placement.  We affirm the true finding on the robbery charge and the dispositional order.

## II.  FACTS AND PROCEDURAL BACKGROUND

### A.  *The Initial Proceedings*

On June 11, 2013, M.D., then age 17, was charged in an amended petition with second degree robbery, a felony (Pen. Code, § 211), resisting a peace officer, a misdemeanor (Pen. Code, § 148, subd. (a)(1)), and assaulting a police officer, a misdemeanor (Pen. Code, § 241, subd. (c)).  At the detention hearing, M.D. was continued in juvenile hall.  Before the jurisdictional hearing, he was accepted into the Gateway residential program should he receive at least 18 months of commitment time. At the jurisdictional hearing on July 23, 2013, the court dismissed the resisting arrest and

assault charges at the request of the prosecution, and proceeded to hear evidence on the robbery charge.[1]

B. *The Jurisdictional Hearing/Evidence of the Robbery*

The evidence presented at the jurisdictional hearing showed the following:  On June 6, 2013, the victim of the robbery was working as a cashier at the convenience store gas station on Mountain Avenue in Chino.  Around 1:15 a.m., the cashier noticed two men walking back and forth by the gas pumps in front of the store and called the police because their actions appeared suspicious.  The two men came into the store and asked to buy cigarettes, but left because they had no money.  The cashier described one of the men as a Black male, approximately five feet five inches tall, and the other as a Hispanic male, between five feet six and five feet seven inches tall.  The cashier recognized the Black male as a regular customer.

The men came back into the store five to ten minutes later with paper bags over their faces.  The Black man was carrying a knife, the other man was carrying a silver tire iron, and they demanded that the cashier give them the money in the cash register.  The Hispanic man was holding the front door open, with the tire iron raised up as if he were preparing to run after the cashier gave them the money.  After the cashier hesitated in

---

[1] The resisting arrest charge was based on M.D.'s flight from police following the June 6, 2013 robbery.  The assault charge was based on an April 2013 incident in which M.D. allegedly attempted to strike a police officer with his elbow after M.D.'s mother asked the officer to speak to M.D. about not attending school.

3

opening the cash register, the "Hispanic guy came very close" to him, with the tire iron raised and said, "Give me the 'F' money."

The cashier threw the money on the counter, the Black man took the money, and the two men ran out of the store. The cashier was certain the robbers were the same men he had seen by the pumps and who asked for cigarettes, because he recognized their voices, they were the same height, weight, and skin tone, and they were wearing the same clothes, except one had put a white T-shirt over his black one. The robbery was recorded on videotape.

The cashier called 911 and described the robbers to the operator. A police officer arrived and interviewed the cashier, who said he could identify the robbers. A short time later, the officer told the cashier they believed they had the Black male suspect. The police took the cashier to a place where the Black male was being detained, and the cashier identified him as the robber with the knife. The Black male robber was an adult, over the age of 18, and had a knife on him when he was arrested. The second suspect, later identified as M.D., jumped over a fence and escaped from the police.

The cashier was unable to sleep and did not go home after identifying the Black male suspect. Around 7:30 p.m. the next evening, some 16 hours after the robbery, the cashier went to the grocery store in the same plaza as the convenience store to buy a sleep aid. As he walked out of the grocery store, he saw the second robber outside the store and called 911. Officer Chris Chinnis met the cashier at the convenience store and drove him, in his patrol car, to where Officer Nathan Messick was holding M.D. outside the

4

grocery store. From inside the patrol car, the cashier identified M.D. as the robber who was holding the tire iron, saying he was 80 percent certain of his identification. Before the cashier identified M.D., Officer Chinnis told him he was not required to identify anyone and not to consider that the suspect was handcuffed.

The cashier did not identify M.D. in court as the robber with the tire iron, saying he did not remember. He also could not recall whether the clothes M.D. was wearing outside the grocery store when he identified him were the same clothes the robber with the tire iron was wearing. Officer Chinnis identified M.D. in court as the man the cashier identified outside the grocery store, and, based on photographs from the surveillance videotape, Officer Chinnis believed M.D. was wearing the same black T-shirt and black shorts that the robber with the tire iron was wearing. Officer Chinnis conceded, however, that M.D. could have been wearing black jeans, and that he, Officer Chinnis, did not watch the videotape.

M.D. had a cell phone and a knife on his person when he was arrested after the cashier identified him. At the police station, Officer Messick advised M.D. of his *Miranda*[2] rights and M.D. agreed to be interviewed by the officer. The entire interview lasted two to three hours. During most of the interview, M.D. denied he was involved in the robbery, but eventually he admitted he was the robber with the tire iron and told a story similar to what the cashier reported.

---

[2] *Miranda v. Arizona* (1966) 384 U.S. 436.

5

M.D. told Officer Messick that he and a friend went into the convenience store to buy cigarettes but left after the clerk asked them for identification. After they left they were angry because they did not get cigarettes, and they discussed robbing the store. He and his friend then made masks to wear, his friend walked into the store with a knife, and he walked in wielding a tire iron. His friend demanded money from the clerk while he stood by the door with the tire iron. He walked toward the clerk and cursed at him, also demanding money. He and his friend fled after the clerk gave them money from the cash register, and discussed robbing another location, but decided not rob another location because the police were in the area. They ran from the police and M.D. jumped over a fence, discarded the tire iron, and escaped.

On cross-examination, Officer Messick testified no cash was found on M.D. when he was arrested, and M.D. was around six feet two inches tall, much taller than the five feet six or five feet seven inches the cashier reported. During the majority of the interview, M.D. denied being involved in the robbery, and at the outset of the interview he told the officer, "Yes, I will talk to you about anything because I want to get out of here." Officer Messick spent the majority of the interview getting M.D. to tell him the truth after M.D. denied being involved in the robbery. He told M.D. it would be "better for his future" if he told the truth, that M.D. reminded him of himself at that age, and he would talk to people at school on M.D.'s behalf. Officer Messick believed M.D. had a bright future, and he was willing to help M.D. M.D. then told the officer he had his (M.D.'s) "trust and respect," and admitted committing the robbery.

6

After both sides rested, M.D.'s counsel argued there was insufficient evidence to find the robbery charge true. Counsel noted that the cashier was only 80 percent certain of his identification of M.D., the cashier's description of M.D.'s height fell well short of M.D.'s actual height, M.D. was only 17 years old, several years younger than the 21-year-old suspect the cashier initially described, and the cashier could not identify M.D. in court. Counsel also argued the credibility of M.D.'s confession was doubtful because M.D. said he wanted to get out of the police station, he denied involvement in the robbery during most of interview, and he confessed to the robbery only after the officer promised him help, which "could be construed as some sort of promise for leniency or coercion." The prosecutor argued there was ample evidence to support the robbery charge. The court agreed, found the robbery charge true, and scheduled a dispositional hearing.

C. *The Dispositional Hearing and Order*

At the initial dispositional hearing on August 6, 2013, counsel for M.D. asked the court to release M.D. on house arrest pending further disposition on the ground the robbery was his first offense and he had been in juvenile hall for 65 days. The court denied the request, noting that even though M.D. had earned 122 out of the maximum 132 points during the prior week in juvenile hall, he had committed a serious crime—a robbery with masks and weapons—and the probation officer believed he was responsible for recent tagging incidents in juvenile hall.

Though M.D. had been accepted into the Gateway program, the court asked the probation department to write a supplemental report assessing alternative placements,

7

including formal probation. The court was concerned about placing M.D. in a lockdown facility such as Gateway because his mother was undergoing treatment for ovarian cancer. The dispositional hearing was continued to allow the probation department to submit its supplemental report.

At a further dispositional hearing on September 5, 2013, probation officer Dana Carter submitted the supplemental report, continuing to recommend the Gateway program for M.D. and a psychiatric evaluation to aid in his rehabilitation. Ms. Carter interviewed M.D. for 20 to 30 minutes to prepare her supplemental report, talked with him twice by telephone, and interviewed his mother.

M.D. had a very traumatic childhood in Russia. His biological mother abandoned him in a grocery store when he was eight years old, he was declared an orphan, and he spent four years in a Russian orphanage before coming to the United States at the age of 12 in 2008. M.D.'s biological mother was an alcoholic girlfriend of Russian mobsters and allowed her boyfriends to beat M.D. Members of the gang killed M.D.'s animals, and he witnessed his mother being stabbed in the stomach. As a young child, M.D. took care of his infant sister while his biological mother was away for days at a time and he had to steal food for him and his sister to eat. His sister was adopted at the age of 2, and he did not see her again until he was adopted by the same mother at the age of 12.

M.D. quickly learned English after he came to the United States at the age of 12 in 2008, and he did well in school while his grandfather, "the one who he would talk to," was living. In 2011, he enrolled in the Junior Marines, reached the level of private, and

tested in the 86th percentile, higher than most of his peers.  In high school, and after his grandfather died, he began hanging around a different group of kids, began smoking marijuana, using other drugs, stopped attending school, and came and went from home as he pleased without letting his mother know his whereabouts.  His mother was no longer able to control him.

In October 2012, M.D.'s mother sent him to Sunset Bay Academy in Rosarito Beach, Mexico, where he underwent psychological counseling and took classes for drug and alcohol abuse.  He did not complete the program because he wanted to come home, and his mother allowed him to come home because she did not want him to feel she had abandoned him.  In April 2013, shortly after M.D. returned home in March 2013, his mother was diagnosed with ovarian cancer.  Her diagnosis and emotional reaction to it made M.D. "los[e] it" and he "didn't care anymore."

While detained in juvenile hall after committing the June 2013 robbery, M.D. felt he was now "in control" and would never do anything like that again.  He initially had problems adjusting in juvenile hall but was now a "high pointer" and was committed to attending school and being a better son to his mother.  He wanted the court and his mother to know he was "really sorry" he made a "stupid mistake" and he wanted to be released on house arrest or probation.

Ms. Carter did not believe M.D. should be released into the community without a psychological evaluation, given the severity of his crime and his history.  She considered alternatives to the Gateway program, but she did not discuss them in her supplemental

9

report because she believed Gateway was the best option for M.D. In her opinion, "stress appeared to catapult [M.D.] into the commission of the crime" and he had not had any therapy or treatment to deal with his stresses. Gateway offered repression therapy for anger management, remedial academics to make up for his lost time in school, individualized therapy, a drug treatment program, family reunification, and career counseling—all in a controlled environment. Even though many of the same services were available in group homes and in the community, in Ms. Carter's opinion Gateway was the best option for M.D. because it offered the services in a controlled environment. Ms. Carter testified that "kids do well in a controlled environment," but when they are in a community they have "a different type of supervision."

The defense called Rich Moscowitz, a social worker with the juvenile division of the public defender's office and a former Orange County sheriff's sergeant who had over 40 years of experience in social work and law enforcement. While previously employed as a supervisor for child protective services in Riverside County, Mr. Moscowitz was involved in determining whether children should be returned to their homes. He was familiar with the Gateway program, "a completely locked-down facility," and testified it would take time for M.D. to graduate from the Gateway program to "Gateway Regional," "a stepping stone to reintegration into the community" where home passes were given.

Mr. Moscowitz believed it was in M.D.'s best interest to be returned home to his mother under close supervision, and his second best option was to be placed in a nonlocked down facility like Boys Republic or Optimist Youth Homes—programs which

10

usually ran from six to nine months before the juvenile was released on aftercare probation. He believed the services in such placements were equal to those offered by Gateway, and the juveniles he had supervised over the previous four years had been successful in such placements. In his opinion, Gateway was the worst option for M.D. because it would "tak[e] him away from the woman who adopted him." Though his mother could visit him at Gateway, the nonlocked down placements offered more flexible visiting options. M.D.'s mother testified she would like him to be returned home on probation because he needed to be with her and his younger sister.

After receiving this testimony, the court told counsel it was not inclined to return M.D. home on probation and that either the Gateway program or a less restrictive placement was the appropriate disposition for M.D. The court continued the dispositional hearing to allow the defense to procure a psychological assessment of M.D., as Ms. Carter was recommending.

In a psychological assessment dated September 15, 2013, Dr. Marjorie Graham-Howard, Ph.D. discussed M.D.'s early childhood and troubled family history. M.D. never had any contact with his father and never had a close or affectionate relationship with his biological mother. In addition to being an alcoholic with a criminal history, he believed his biological mother may have had mental health problems. According to M.D., his biological mother was "always angry and fighting with everyone" and would hit him, punch him, and whip him with a belt nearly every day, mostly when she was

intoxicated. He received emotional and practical support from his maternal grandmother, but after she died he lost his only stable parental figure.

Dr. Graham-Howard believed M.D. suffered from reactive detachment disorder, which meant he did not bond easily with others. She also believed M.D. was depressed and had abused alcohol and marijuana to cope with his depression. Regarding disposition, Dr. Graham-Howard recommended against returning M.D. home because he was "beyond the care and control of his mother," and if returned home he "would likely resume many of the behaviors that he had been engaging in prior to his detention." Her "preference" was to see M.D. placed in "a more home-like placement" for six to nine months, "with greater emphasis put on working with the mother to strength[en] the home setting for his return there." She did not recommend placing M.D. in the Gateway program, because it was "not clear" he would benefit from its "strict-detention model" and such a long-term, out-of-home placement "is likely to disrupt the mother-son emerging relationship."

At the continued dispositional hearing on October 3, 2013, the court noted it had reviewed Dr. Graham-Howard's assessment, a letter from M.D., and M.D.'s most recent detention behavior report from juvenile hall dated October 3. The October 3 detention behavior report showed M.D. had been in a fistfight with another juvenile on September 9 and tried to brew alcohol in his room by fermenting fruit in a bottle.

The October 3 report was not entirely negative: M.D. was still respectful to staff and showed "good" academic work habits and behavior. M.D.'s August 6 and September

5 detention behavior reports were "excellent" and contained no reports of negative behaviors. M.D. was the "high pointer" in his unit for five weeks in a row, he did not let the negativity of other minors influence his behavior, he held a unit job, and he was a "phenomenal artist." In his letter to the court, M.D. said he knew what he did was wrong, he took responsibility for his actions, and he had learned his lesson. He regretted the stress he had caused his family, and he wanted to return home, change his life around, and "be a better person" to his family and society. His goal was to complete school and join the Marine Corps.

M.D.'s counsel argued M.D. should be placed in a group home, based on his need to bond with his mother and as Dr. Graham-Howard and Mr. Moscowitz were recommending. The prosecutor argued M.D. should be placed in the Gateway program, based on his recent behaviors in juvenile hall and his anger management problem. The prosecutor argued the Gateway program would not be like jail because it would allow for family visits and for M.D. to return home on weekends, and it was unclear whether Dr. Graham-Howard understood that Gateway offered these options through its family reunification program.

The court declared M.D. a ward of the court under Welfare and Institutions Code section 602, and ordered him into the Gateway program for the maximum allowable period of five years, with 119 days custody credit. The court cited M.D.'s apparent inability to "keep it together for a very long amount of time" as indicated in the October 3

detention behavior report, his need for rehabilitation, the seriousness of the robbery, and the need to protect the community.  M.D. timely appealed.

III.  DISCUSSION

A.  *M.D.'s Confession Was Voluntary and Properly Admitted*

M.D. claims his confession to Officer Messick that he was the second robber with the tire iron was involuntarily made, and the product of coercion, because he confessed only after he was interrogated for two to three hours and was promised leniency.  The People argue M.D. has forfeited this claim because he did not raise it in the trial court:  he never claimed his confession was involuntary and therefore inadmissible.  We agree the claim has been forfeited because it was not raised in the juvenile court.  (*People v. Michaels* (2002) 28 Cal.4th 486, 512.)  Nonetheless, the claim lacks merit.

"The Fourteenth Amendment of the federal Constitution and article I, section 7 of the California Constitution make 'inadmissible any involuntary statement obtained by a law enforcement officer from a criminal suspect by coercion.'  [Citations.]"  (*People v. Sapp* (2003) 31 Cal.4th 240, 267.)  "A statement is involuntary and, thus, inadmissible if it is obtained by threats or promises of leniency, whether express or implied" (*People v. Clark* (1993) 5 Cal.4th 950, 988) or "by the exertion of any improper influence" (*People v. Ramos* (2004) 121 Cal.Ap.4th 1194, 1201).  "Voluntariness does not turn on any one fact, no matter how apparently significant, but rather on the 'totality of [the] circumstances.'" (*People v. Neal* (2003) 31 Cal.4th 63, 79.)  The prosecution has the

14

burden of proving the voluntariness of a confession by a preponderance of the evidence. (*People v. Sapp, supra,* at p. 267.)

Courts consider many factors in determining whether a confession was voluntary, including the length of the interrogation, its location, its continuity, and the defendant's maturity, education, physical condition, and mental health. (*People v. Boyette* (2002) 29 Cal.4th 381, 411.) The essential question is whether the defendant's choice to confess was not "'"essentially free"'" because his will was overborne. (*People v. Massie* (1998) 19 Cal.4th 550, 576.) On appeal, the trial court's factual findings concerning the circumstances surrounding the confession are upheld if supported by substantial evidence, but the voluntariness of the confession is a legal question subject to independent review. (*People v. Boyette, supra,* at p. 411.) Here, uncontradicted evidence shows M.D.'s confession was voluntary. (See *In re Shawn D.* (1993) 20 Cal.App.4th 200, 207-208.)

M.D. argues his confession was involuntary because he was interrogated for two to three hours, without his adoptive mother present, and he only confessed to the robbery after Officer Messick promised him leniency. M.D. points out that Officer Messick told him he reminded him of himself when he was younger and promised M.D. he would talk to people at M.D.'s school on M.D.'s behalf.

We disagree that these circumstances rendered M.D.'s confession involuntary, or not a product of his free will. Officer Messick's promise to speak to people at M.D.'s school on M.D.'s behalf—if M.D. told the truth about the robbery—merely created an

15

atmosphere of trust between M.D. and the officer.  As M.D. concedes, being sympathetic or friendly to an accused is not coercive and does not render a confession involuntary. (*United States v. Posada-Rios* (5th Cir. 1998) 158 F.3d 832, 866.)

As a general matter, ""'"any promise made by an officer or person in authority, express or implied, of leniency or advantage to the accused, if it is a motivating cause of the confession, is sufficient to invalidate the confession and to make it involuntary and inadmissible as a matter of law."'  [Citations.]"  (*People v. Ray* (1996) 13 Cal.4th 313, 339-340.)  But Officer Messick did not promise M.D. leniency; instead, he discussed the consequences that would result if M.D. told the truth:  the officer would support M.D. by speaking to others on his behalf, and "investigating officers are not precluded from discussing any 'advantage' or other consequence that will 'naturally accrue' in the event the accused speaks truthfully about the crime.  [Citation.]  The courts have prohibited only those psychological ploys which, under all the circumstances, are so coercive that they tend to produce a statement that is both involuntary and unreliable.  [Citations]." (*Id*. at p. 340.)  Officer Messick's promise to speak to others on M.D.'s behalf, if M.D. told the truth about the robbery, did not make M.D.'s confession a product of coercion.

Nor did any of the other circumstances surrounding the confession render it involuntary and unreliable, or not the product of M.D.'s free will.  The entire interview was not long.  It lasted two to three hours and occurred soon after M.D. was taken into custody.  There was no evidence that M.D. was deprived of food or water or asked that his mother or anyone else be present.  Nor is there any indication that M.D.'s young age

16

of 17, lack of experience with law enforcement or the criminal justice system, desire to end the interview, or emotional state rendered his confession involuntary or unreliable. Indeed, there was no indication that M.D. was emotionally or physically distressed when he confessed, or that his age, lack of experience, desire to end the interview, or any other circumstance overcame his free will and caused him to falsely confess. Additionally, the cashier's description of the robbers and the robbery corroborated M.D.'s confession.

B. *The Cashier's In-field Identification of M.D. Was Not Unduly Suggestive*

M.D. claims the cashier's in-field identification of him as the robber wielding the tire iron should have been excluded because it was unduly suggestive and unreliable, and therefore violated his due process rights. The People argue, and we agree, that M.D. also forfeited this claim by not raising in the juvenile court. (*People v. Medina* (1995) 11 Cal.4th 694, 752.) Nevertheless, this claim lacks merit.

"It is well established that convictions based on eyewitness identification at trial, after a pretrial identification, constitute a denial of due process only if the pretrial identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." (*People v. Johnson* (1989) 210 Cal.App.3d 316, 322, citing *Stovall v. Denno* (1967) 388 U.S. 293, 301-302.) Although a one-person show up may pose a danger of suggestiveness, such identifications are not necessarily or inherently unfair. (*People v. Medina, supra,* 11 Cal.4th at p. 753.) Rather, there must be a "'substantial likelihood of irreparable misidentification' under the ""totality of the circumstances . . . ."'" (*People v. Cunningham* (2001) 25 Cal.4th 926,

17

990.)  The defendant has the burden of showing the identification procedure was unduly suggestive and, therefore, unfair or unreliable.  (*Id.* at p. 989.)

"'In order to determine whether the admission of identification evidence violates a defendant's right to due process of law, [courts] consider (1) whether the identification procedure was unduly suggestive and unnecessary, and, if so, (2) whether the identification itself was nevertheless reliable under the totality of the circumstances, taking into account such factors as the opportunity of the witness to view the suspect at the time of the offense, the witness's degree of attention at the time of the offense, the accuracy of his or her prior description of the suspect, the level of certainty demonstrated at the time of the identification, and the lapse of time between the offense and the identification.'  [Citation.]"  (*People v. Alexander* (2010) 49 Cal.4th 846, 901-902.)

"If, and only if, the answer to the first question is yes and the answer to the second is no, is the identification constitutionally unreliable.  [Citation.]"  (*People v. Gordon* (1990) 50 Cal.3d 1223, 1242; *People v. Yeoman* (2003) 31 Cal.4th 93, 125 ["Only if the challenged identification procedure is unnecessarily suggestive is it necessary to determine the reliability of the resulting identification."].)  We independently determine whether an identification procedure was unduly suggestive, particularly when, as here, the relevant circumstances are undisputed.  (See *People v. Gonzalez* (2006) 38 Cal.4th 932, 943; *People v. Kennedy* (2005) 36 Cal.4th 595, 608.)

M.D. argues the cashier's identification of him at the in-field showup outside the grocery store, 16 hours after the robbery, was unduly suggestive because "there was no

18

urgency to conduct an in-field show up rather than a regular lineup back at the police station" and also because Officer Chinnis, who conducted the showup, told the cashier, "just say he's the guy or not" because the cashier was the one who called the police to report he had just seen the second robber outside the grocery store.

Neither of these circumstances rendered the cashier's in-field identification of M.D. unduly suggestive. First, the claimed lack of urgency to conduct the in-field showup was offset by the need to quickly rule M.D. in or out as the second robber. As Division One of this court has explained: "[S]ingle-person showups *for purposes of in-field identifications* are encouraged, because the element of suggestiveness inherent in the procedure is offset by the reliability of an identification made while the events are fresh in the witness's mind, and because the interest of both the accused and law enforcement are best served by an immediate determination as to whether the correct person has been apprehended." (*In re Carlos M.* (1990) 220 Cal.App.3d 372, 387.)

Second, Officer Chinnis never suggested to the cashier that M.D. was the second robber. Instead, he told the cashier he did not have to identify anyone and not to consider the fact M.D. was handcuffed.[3] As stated, single-person showups are not inherently unfair, and the defendant "must show unfairness as a demonstrable reality, not just speculation. [Citation.]" (*In re Carlos M., supra,* 220 Cal.App.3d at p. 386.) M.D. has not met this burden. The in-field identification was not unduly suggestive.

---

[3] As the People point out, it is unclear from the record whether M.D. was handcuffed at the in-field showup.

19

Finally, M.D. argues the cashier's in-field identification was unreliable because the second robber had a paper bag over his head during the robbery, the cashier initially described the second robber as a 21-year-old Hispanic male, five feet seven inches tall, M.D. is a Russian male, six feet two inches tall, then 17 years old, and the cashier was only 80 percent certain of his in-field identification and did not identify M.D. in court.

The cashier's in-field identification of M.D. was reliable under the totality of the circumstances and therefore admissible, despite the discrepancies in the cashier's description of the second robber, his failure to identify M.D. at trial as the second robber, and the 80 percent certainty of his in-field identification. (*People v. Lindsay* (1964) 227 Cal.App.2d 482, 493-494 [strength or weakness of identification evidence goes to its weight, not its admissibility; to be inadmissible, identification evidence must be so weak as to constitute no evidence at all]; *In re Gustavo M.* (1989) 214 Cal.App.3d 1485, 1497 ["when the circumstances surrounding the identification and its weight are explored at length at trial, where eyewitness identification is believed by the trier of fact, that determination is binding on the reviewing court"].)

The cashier had ample opportunity to view both robbers, without their masks, shortly before the robbery when he noticed them pacing outside the convenience store by the gas pumps. The cashier believed they were acting suspiciously and called the police. The cashier also recognized the robbers' voices when they came into the store to rob it, because they came into the store and tried to buy cigarettes without their masks shortly before the robbery. Then, only 16 hours after the robbery, the cashier recognized M.D. as

20

the second robber when he saw him outside the grocery store. M.D. has brown hair and brown eyes, similar to many Hispanic males. And even though the cashier's initial estimate of M.D.'s height and age were off by as much as five inches and four years, respectively, M.D. immediately recognized M.D. as the second robber when he saw him outside the grocery store 16 hours after the robbery.

In sum, the single-person in-field lineup procedure was not unduly suggestive, and the cashier's in-field identification of M.D. was reliable under the totality of the circumstances. It was therefore properly admitted.

C. *M.D.'s Substantial Evidence Claim Lacks Merit*

M.D. next claims that *if* the evidence of his confession and the cashier's in-field identification of him had been excluded, then insufficient evidence supports the court's true finding on the robbery charge. (*People v. Johnson* (1980) 26 Cal.3d 557, 576 [due process requires that criminal conviction be supported by substantial evidence].)

This claim fails simply because M.D.'s confession to the robbery and the evidence of the cashier's in-field identification of him as the second robber were properly admitted, for the reasons explained. M.D. does not argue that insufficient evidence supports the true finding *if*, as we have concluded, the complained-of evidence was properly admitted. It is therefore unnecessary to discuss whether substantial evidence supports the finding, given that M.D.'s confession and the in-field identification evidence were properly admitted.

21

D. *The Court Did Not Abuse Its Discretion in Ordering M.D. Into the Gateway Program*

Lastly, M.D. claims the juvenile court abused its discretion in ordering him into the Gateway program rather than a less restrictive, nonsecure placement. We find no abuse of discretion in the commitment order.

"We review a juvenile court's commitment decision for abuse of discretion, indulging all reasonable inferences to support its decision." (*In re Antoine D*. (2006) 137 Cal.App.4th 1314, 1320.) "'[D]iscretion is abused whenever the court exceeds the bounds of reason, all of the circumstances being considered.'" (*In re Carl N.* (2008) 160 Cal.App.4th 423, 432, quoting *People v. Giminez* (1975) 14 Cal.3d 68, 72.) We will not disturb the juvenile court's findings when there is substantial evidence to support them. (*In re Carl N., supra*, at p. 432.) "'In determining whether there was substantial evidence to support the commitment, we must examine the record presented at the disposition hearing in light of the purposes of the Juvenile Court Law.'" (*Ibid.*)

"The purpose of the juvenile court law is 'to provide for the protection and safety of the public and each minor under the jurisdiction of the juvenile court and to preserve and strengthen the minor's family ties whenever possible, removing the minor from the custody of his or her parents only when necessary for his or her welfare or for the safety and protection of the public. If removal of a minor is determined by the juvenile court to be necessary, reunification of the minor with his or her family shall be a primary objective. If the minor is removed from his or her own family, it is the purpose of this chapter to secure for the minor custody, care, and discipline as nearly as possible

22

equivalent to that which should have been given by his or her parents.  This chapter shall be liberally construed to carry out these purposes.' ([Welf. & Inst. Code,] § 202, subd. (a).)" (*In re Oscar A.* (2013) 217 Cal.App.4th 750, 756.)

M.D. argues the juvenile court abused its discretion in committing him to the Gateway program based on his recent fighting and attempts to make alcohol in juvenile hall, the seriousness of the robbery, his need for rehabilitation, and public safety concerns.  He argues the court "disregarded" "overwhelming" evidence that *his needs* could be met in a less restrictive facility, and argues his counsel "introduced a wealth of documentary and expert evidence" to support placing him "in the least restrictive placement possible," where he could receive needed services and treatment without disrupting his need to bond with family.  He also points out that he had already been detained in juvenile hall for 119 days at the time of the order committing him to the Gateway program.

As the People concede, a minor cannot be committed to a locked facility such as Gateway solely for retributive purposes or for punishment; there must be evidence of a probable benefit to the minor and that less restrictive placements would be ineffective or inappropriate.  (*In re George M.* (1993) 14 Cal.App.4th 376, 379; see Welf. & Inst. Code, §§ 202, subd. (b), 734.)  The juvenile court must *consider* less restrictive placements, but the court is not required to attempt them before committing a minor to a locked facility. (*In re Teofilio A.* (1989) 210 Cal.App.3d 571, 577.)  Courts have recognized that amendments to the juvenile court law, enacted in 1984, "reflected an increased emphasis

23

on punishment as a tool of rehabilitation, and a concern for the safety of the public." (*In re Asean D.* (1993) 14 Cal.App.4th 467, 473; *In re Teofilio A., supra,* at pp. 575-576.) In light of these principles, M.D.'s claims are without merit. The court did not abuse its discretion in rejecting less restrictive placements and committing him to the Gateway program.

The record shows the juvenile court considered less restrictive placements but reasonably found them inappropriate in light of the seriousness of the robbery, M.D.'s need for extensive rehabilitation, and the need to protect the public. The court reasonably took public safety concerns into account in ordering M.D. into the Gateway program, in view of the seriousness of the robbery and M.D.'s demonstrated inability to "keep it together" or stay out of trouble for more than several months at a time. M.D. had a traumatic childhood in Russia and an unresolved anger management problem. He did not benefit sufficiently from his five-month stay at the Sunset Bay Academy in Mexico where his mother placed him from October 2012 to March 2013, and he did not consistently stay out of serious trouble while detained in juvenile hall. The Gateway program offered extensive rehabilitative services—the same services available in less restrictive placements—but in a controlled environment. M.D.'s family would be able to visit him at Gateway, and if he complied with the program he would be allowed to return home on weekends.

In sum, ample evidence supports the juvenile court's determination that M.D.'s rehabilitation would best be ensured by committing him to Gateway rather than a less

restrictive placement, and that public safety concerns also required the court to select Gateway over a less restrictive placement.

## IV.  DISPOSITION

The juvenile court's true finding on the robbery charge and its October 3, 2013, dispositional order committing M.D. to the Gateway program are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

<u>KING</u>
                                                            J.


We concur:

<u>HOLLENHORST</u>
            Acting P. J.

<u>CODRINGTON</u>
                        J.